# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SAMUEL K. JACOBS, et al,

     **PLAINTIFFS,**

v.

SIDNEY S. FRIEDMAN, et al,

     **DEFENDANTS.**

CASE NO.: 1:07CV01625

HONORABLE JUDGE:
REGGIE B. WALTON

---

## AMENDED COMPLAINT FOR CONSPIRACY UNDER

## RACKETEERING INFLUENCED ACT AND CORRUPT ORGANIZATIONS ACT (RICO)

## PER JULY 10, 2008 ORDER

COMES NOW the Plaintiffs Samuel K. Jacobs and Nancy Heckerman who hereby comply with the Order issued by the Honorable Reggie B. Walton on July 10, 2008. Plaintiffs have completely rewritten this Complaint in order to meet the Honorable Court's requirements. The Plaintiffs are appreciative that this Court stated that it was obvious that the Court had read the case several times before coming to a decision, and this denotes a fair and impartial Honorable Court.

The Plaintiffs have attached an APPENDIX TO AMENDED COMPLAINT to this pleading concerning the Consumer Protection Act. Plaintiffs are Citizens of the community and attempt to keep up with the laws that affect their own business and try to adhere to those laws. *Plaintiffs are not here to tell the Court what to do, but to ask the Court to resolve a complex dispute by telling their side of the argument with points and authorities in support of their complaint.* The length of this Complaint is dictated by the number of events, persons and enterprises involved in

**RECEIVED**

AUG 1 1 2008

Clerk, U.S. District and
Bankruptcy Courts

this case. Plaintiffs desire to see an end to four years of disputeand Plaintiffs are desirous of a final resolve to these issues.

Plaintiffs submit these laws on their behalf for the Court's interpretation to state their rational for filing this lawsuit. The laws were enacted for a purpose, and if the Defendants are allowed, as "debt collectors" who are governed by these laws, to decidedly and continuously violate the laws in their everyday manner of business, then what is the purpose of having laws which the Citizen cannot ask to be enforced?__Plaintiffs state the following, to-wit:

A. That the Plaintiffs state that they have a great deal of confusion about the requirements for this RICO Complaint since fraud is a key factor for these alleged  white collar crimes. On the one hand, Rule 8 (General Rules of Pleading) was enacted and enlarged in order to put less burden on the courts, but this assembly line brand of law is difficult to assimilate into a RICO complaint when "fraud" in alleged in almost every averment and Rule 9 (Pleading Special Matters) is used to define fraud pleadings. Plaintiffs have attempted to state the issues and facts of this RICO case so carefully and thoroughly  to justify granting the case a full trial upon the merits of the cause of action.

B.  That this complaint deals squarely with the fact that the telephone was used on at least two different occasions in February, 2007, to deliver threats which were serious violations of the Fair Debt Collection Practices Act as well as mainstay RICO violations. When the witnesses are deposed they will be asked to state the specific times the events occurred through the office records.

C.  That the Plaintiffs simply pose the following questions for the Court's consideration, and, humbly request an interpretation for their dilemma with guidelines to unravel these contradictions. Plaintiffs ask the Honorable Court to answer these following questions concerning this RICO case:

a. That should  the complaint follow Rule 9 (Pleading Special Matters) requirements in order to  detail the averred acts of fraud to meet the Title 18 U.S.C.A. § 1961 (Definitions) criteria, or does the Complaint use only the more remedial Rule 8 (General Rules of Pleading) instructions for a short and concise pleading which risks having the case dismissed for failure to  define each RICO element of repetition, continuity, fraud, statute citation coordination, and the minimum two acts requirements?

b. That the Plaintiffs aver that if they the  RICO complaint must connect  the overt acts to the proper statutes, then it usually takes more than one statute citation to establish the pattern of racketeering activities through the RICO persons[1]  and RICO enterprises. They have stated these relationships, and since a RICO enterprise cannot be a RICO person, included additional definitions and citations to prove the allegations.

D.   That the Plaintiffs have attempted to  follow the minimum requirements for an initial RICO pleading, and have endeavored to make the pleading as brief as possible while adhering to the following:

a). They have alleged at least two overt acts from the RICO statutes  specifically named  in Title 18 U.S.C.A. § 1961 (Definitions), Title 18 U.S.C.A. § 1956 (Laundering of monetary instruments) or Title 18 U.S.C.A. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity).

b) They have attempted to prove  that there are multiple RICO enterprises and RICO persons and how each interactione with the other parties establishes  the details of the alleged conspiracy. Can there be a RICO cause of action without a conspiracy? Plaintiffs state that it is the conspiracy

---

[1] "Association does not require that the defendant be employees by or legitimately  connected to the racketeering enterprise." *United States v. Mokol,* 957  F.2d 1410, 1417 (7th Cir 1992).

AMENDED  COMPLAINT—Page 3 of 48

among the RICO persons which make this primarily a RICO cause of action since the very first RICO statute, Title 18 U.S.C.A. § 1951 (Interference with commerce by threats or violence), begins with the fact that violators of the statute have "conspired."

c) Since every RICO violation must have a mode or means by which the RICO person or RICO Defendant[2] committed the crime through the RICO enterprise, the mode used by these RICO persons was obviously the telephone in almost every actual or attempted RICO crime. This staple of most RICO complaints was the most easy to prove since either the victims or the RICO person supplied the needed confirmation of the overt acts, sometimes even in writing.

d) That the Plaintiffs assert that the threats and harassment in harsh abusive language are the main overt acts by the Defendants have violated Title 15 U.S.C.A. § 1692d. (Harassment or abuse) and § 1692e. (False or misleading representations). Plaintiffs cite statutes for threats from the three different Titles of the United States Code in this pleading. Each statute under each separate Title of the United States Code must be adequately detailed, even if it runs contradictory to remedial Rule 8 (General Rules of Pleading) short and concise generalizations.

e) Finally, the pleading has detailed how each overt or predicate acts is prohibited under Title 18 U.S.C.A. § 1962 (Prohibited activities).

E.  That if all of the issues stated in this Complaint cannot be addressed in this one case, then Plaintiffs will filed related complaints until all of the issues are resolved among these parties.

## I. PARTIES

1.      The names and addresses of the Plaintiffs are as follows:

---

[2] By naming Imrex as a defendant but not as the enterprise, Sedima avoided implicating the enterprise-defendant distinction question. Liability may be imposed only on the culpable "person," not on the enterprise. 1962(c).

The majority decisions focus on section 1962(c)'s language, concluding (as the Seventh Circuit put it) that a person cannot be "employed by or associated with itself."

a.  SAMUEL K. JACOBS, (hereafter known as "Jacobs"), and his address is 2300 M Street NW, Suite 800, Washington, D.C. 20037; and,

b.  NANCY HECKERMAN, (hereafter known as "Heckerman"),and her address is 2300 M Street NW, Suite 800, Washington, D.C. 20037.

Except where the context is otherwise indicated, reference to "Plaintiffs" refers to each of the named Plaintiffs.

2.    On information and belief, the names and addresses of the defendant corporations and individuals are as follows:

a.  SIDNEY S. FRIEDMAN, Executive Centre, 4 Reservoir Circle, Baltimore, Maryland 21208-7301, has represented Defendants Yelin Shi and Yu Fan for more than two years in cases which the Plaintiffs have filed against these Defendants;

b.  GREG I. ROSE, Executive Centre, 4 Reservoir Circle, Baltimore, Maryland 21208-7301, is licensed to practice in this State and has previously filed an Appearance in this Court for at least two cases;

c.  WEINSTOCK, FRIEDMAN & FRIEDMAN, P.A., Executive Centre, 4 Reservoir Circle, Baltimore, Maryland 21208-7301, is a professional association which transacts its affairs in the District of Columbia as well as other States through wire and mail;

d.  YELIN SHI, (a.k.a. JACK SHI), individually and jointly, resides at 12922 River Road, Potomac, Maryland 20854, has known the Plaintiffs for over and has a furniture business named "STARLIN INTERIORS" at 9748 Traville Gateway Drive, Rockville, Maryland 20850. He is the purported husband of Yu Fan; and,

e.  YU FAN, individually and jointly, resides as 12922 River Road, Potomac, Maryland 20854, and is a registered Real Estate Broker in the District of Columbia, Maryland and Virginia.

Some of the names of her firms are: Nations realty, United Realty, and BMI Realtors. Yu Fan has claimed that she resides, conducts her affairs, or has an agent who transpires her affairs in Washington, D.C.

## II.  JURISDICTION AND VENUE

3.   That the jurisdiction for this cause lies with Article I, § Section 8, cl. 3; Amendment IV; and Amendment V of the Constitution of the United States, and, Title 28 U.S.C.A. § 1331 (Federal Question). Parties may be Citizens of two different countries: Plaintiffs are Citizens of the United States, and the Defendants may be residents or Citizens of the United States.

a.  The laws enacted thereof entitled  Title 18 U.S.C.A. § 1346 (Definition of "scheme of artifice to defraud") in conjunction with the RESTATEMENT (SECOND) OF  RESTITUTION, QUASI CONTRACTS, AND CONSTRUCTIVE TRUSTS, § 202(c);

4. That, furthermore, in conjunction with the aforementioned violations of the Constitution of the United States, the Plaintiffs cite the following statutes which the Defendants are alleged to have violated:

a.  Title 18 U.S.C.A. § 241 (Conspiracy against rights);

b.  Title 18 U.S.C.A. § 373 (Solicitation to commit a crime of violence);

c.  Title 18 U.S.C.A. § 875(b),(c), and (d) (Interstate communications);

d.  Title 18 U.S.C.A. § 893 (Financing extortionate extensions of credit);

e.  Title 18 U.S.C.A. § 894 (Collection of extensions of credit by extortionate means);

f.  Title 18 U.S.C.A. § 1028 (Fraud and related activity in connection with identification  documents, authentication features, and information);

g.  Title 18 U.S.C.A. § 1343 (Fraud by wire, radio, or television);

h.  Title 18 U.S.C.A. § 1346 (Definition of "scheme or artifice to defraud");

i. Title 18 U.S.C.A. § 1951 (Interference with commerce by threats or violence);

j.  Title 18 U.S.C.A. § 1956 (Laundering of monetary instruments);

k.  Title 18 U.S.C.A. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity);

l.  Title 18 U.S.C.A. § 2332b (Acts of terrorism transcending national boundaries);

m.  Title 18 U.S.C.A. § 1692c. (Communication in connection with debt collection);

n.  Title 15 U.S.C.A. § 1692d. (Harassment or abuse);

o.  Title 15 U.S.C.A. § 1692e. (False or misleading representations);

p.  Title 15 U.S.C.A. § 1691e. (Civil liability);

q.  Title 12 U.S.C.A. § 208.62 (Suspicious activity reports); and,

r.  Title 12 U.S.C.A. § 1818 (Termination of status of insured bank).

5.  That venue is still proper in this district for the review of this Complaint under Title 28 U.S.C.A. § 1391(b) (Venue generally), and the clause in that statute which states: "*except as otherwise as provided by law*", is the criteria by which this Complaint is filed pursuant to Title 18 U.S.C.A. § 1965 (a), (b) and (d) (Venue and process) which designates that a proceeding may be instituted in any court in any district (of a United States District Court) wherein a defendant is known [3] or "*resides, is found, has an agent, or transacts his affairs*" is pertinent because all of the parties have an agent, are found, or transact their affairs in the District of Columbia, and the main incident as stated in this Complaint occurred in the District of Columbia through wire fraud.

---

[3] FRCvP Rule 65. Injunctive relief.— One fundamentally simplistic but potentially compelling argument is that a federal court has inherent power to issue equitable relief, or, alternatively, that § 1964(a) of RICO itself provides that the district courts have "*. . . jurisdiction to restrain violations of § 1962 of this chapter. . .*"

6. That the value in controversy is over $75,000.00 and the parties, or their incorporated place of business, are citizens of, or reside in, different states.[4] The Plaintiffs claim damages in excess of $6,230,000.00. Trial by Jury requested pursuant to **Amendment VII** of the Constitution of the United States and **Rule 38 of the Federal Rules of Civil Procedure**.

### III. HISTORY

7. That what started as a business venture to sell goods to China pursuant to an oil contract and a soy bean contract between Yelin Shi and Samuel K. Jacobs through Petroleum Financial Services Corporation was turned by Defendants Shi and Fan into a fraud through breach of contract and inducement to breach of contract affecting third parties. Plaintiffs have one contracts and a letter, and copies of the other contract can be obtained from Europe. (Copies of one of those contracts and a letter are attached as 'Exhibit A' to this pleading and incorporated by reference herein.)

8. That at this point in this Complaint, the Plaintiffs' damages and losses far exceeds the amount of the contracts through loss of good will and loss of reputation. After over thirty years of healthy business relationships with international companies, irreparable damage to the Plaintiffs' reputation and ability to perform in new contracts has been severely affected.

9. That Plaintiffs attach the copy of two sets of Answers to Interrogatories ('Exhibit B') which were submitted to Defendant Friedman in Case Number: 1:07cv395. These Answers recite the dates, places and persons involved in these contractual agreements. **Actions with suppliers concerning these two contracts have occurred continuously since their inception, and the last actions occurred only two months ago in Europe and New York.**

---

[4] A person has statutory standing if the person has constitutional standing and is within the plaintiff class the statute creates. *Federal Election Commn. v. National Conservative Political Action Comm.*, 470 U.S. 480, 484-490 (1985).

10. That, unfortunately, the attorney for the Plaintiffs, Mr. G.A.J. Dolk, died last year and held the copy of the contracts. A true and correct copy of the PLAINTIFF JACOBS' ANSWERS TO DEFENDANTS' INTERROGATORIES and PLAINTIFF HECKERMAN'S ANSWERS TO DEFENDANTS' INTERROGATORIES is attached to this pleading as 'Exhibit B' and incorporated by reference herein.)

11. That the Plaintiffs have contacted the other companies and people involved in these transactions and they will be able to obtain their copy of the contracts from their microfiche files. However, the copies cannot be obtained until after the vacation holiday in Europe during which entire companies shut down so that all employees vacation at the same time.

12. That these records will prove that the $140,000.00 costs for the travel expenses, attorneys and accountants who prepared and executed those contracts were justified at the time when both Jacobs and Shi traveled to Europe. The costs kept accruing after the $140,000.00 was spent for these expenditures. Then Defendant Yelin Shi claimed that he should have that money returned to him because his scheme did not work in his favor with his Chinese Government.

13. That these Plaintiffs will not relent on the fact that the contracts were made and signed, this $140,000.00 was a only a partial but binding fee guaranteeing the contracts and the rest of the payment, and that there are substantial losses which exceed the amount of $6,230,000.00 demanded in this Complaint. Defendants Yelin Shi and Yu Fan refused to accept responsibility for the breached contracts since the objective of defrauding the Plaintiffs had not been completed with the unpaid deliveries having never been delivered to China.

14. That Plaintiffs state that these two breached contracts for soy beans and crude oil are an amount more than sufficient to act as a counterclaim to setoff this $140,000.00 demanded by Defendants Yelin Shi and Yu Fan. These contracts are going to be heard in some other Court if not

this one, and will be presented by another party  because these other companies are not going to let $6,230,000.00 slide by since the time to write them off has passed for the tax authorities.

15.   That to support these allegations, the Plaintiffs can produce contracts, a letter to Yelin Shi's Chinese counterparts from Petroleum Financial Services Corporation which was signed by Yelin Shi as a Director, and, sometime during this trial, a copy of the complaint which will be filed by Cargill Corporation for breach of contract against Yelin Shi, Yu Fan, and Samuel K. Jacobs.

16.   That the issues of those two contracts have never been heard in any court where these parties have litigated these events, and the Plaintiffs pray that they Honorable Court proceed with this case so that this cause may be heard upon its merits in preparation for the Cargill Corporation complaint in order that some settlement agreement might be reached with Cargill before trial.

CONSPIRACY HISTORY:

17. That without greatly elaborating, the Plaintiffs discovered that the Defendants Yelin Shi and Yu Fan were in conspiracy with another Chinese citizen who had defrauded the Plaintiffs of $1,500,000.00 through the Bank of China through several business ventures in 1996. Unbeknownst to the Plaintiffs, Defendants shi and Fan were at all times conspiring with  the other Chinese agents the Plaintiffs since they "had lost their face" when Plaintiffs filed against them to recover the $1,500,000.00. The case was never resolved due to political influence.

18.   That the Plaintiffs have the copies of the deposits for the $1,500,000.00 made for a business venture for computers through a wire transfer to a bank account at the Bank of China in Shanghai belonging to this Chinese agent, and her supposed ex-husband,  from the HSBC Bank in Hong Kong. The Chinese agent became furious when it was revealed that she had houses and airplanes in the United States which totaled in the seven figures,  and owned half of  the company

worth eight figures which manufactures ViewSonic computer monitors in Taiwan. This was a problem for her since she claimed only a $35,000.00 yearly U.S. income.

19. That Defendants Yelin Shi and Yu Fan were instructed by this other agent to meet the Plaintiffs who lived in the same neighborhood as Shi and Fan, and to induce the Plaintiffs into another scam in China by contracting for goods to be sent to China. The Defendants Shi and Fan never fulfilled the obligations for the Letters of Credit for either contract, and although the ship was almost to China before the Plaintiffs discovered the fraud and the ship was turned around, the soy bean shipment was lost due to spoilage.

20. That the same breach of contract through failure to establish a Letter of Credit occurred for the contract for crude oil, but the ship was rerouted to another destination. However, the Plaintiffs have been left with the cost of making all of the arrangements for the tanker and the loading of the oil, and owe for the transporting the crude oil to the point where it was turned back. This is no small amount since it costs millions of dollars to make these arrangements and the $140,000.00 which Yelin Shi and Yu Fan are claiming is a mere pittance compared to all of the costs which they accumulated for this fiasco.

21. That Yelin Shi insisted that the Plaintiffs open an account in Chevy Chase Bank through his Chinese friend in order to supposedly consummate the two contracts for soy beans and crude oil, but that was not the real reason for the account. Defendants Shi and Fan used the bank employee to monitor the Plaintiffs' bank account and through that bank employee, Yelin Shi was informed of not only the Plaintiffs' private and personal purchases, but their location through travel itineraries and hotel bills after the Plaintiffs left their residence in Potomac, Maryland.

22. That since Defendant Shi had previously tormented the Plaintiffs with threats to use kickboxing to injure or kill them, had threatened to hire a Chinese hit man for $5,000.00 in New

York to kill the Plaintiffs, and had actually came to the school of the Plaintiffs' grandchild and threatened to kidnap or harm her, the information Defendant Yelin Shi gathered from that bank employee was truthfully and explicitly life threatening to the Plaintiffs.

23. That Defendant Yelin Shi and Yu Fan demanded the $140,000.00 back which was the expense money already spent to arrange the two contract ventures and the Plaintiffs refused and reminded these Defendants that they would most likely be sued for breach of contract if some arrangement was not made with the suppliers. Defendants continually demanded this $140,000.00 expense money when they owed over by then $6,230,000.00 for the two breached contracts.

24. That Plaintiffs refused to give the Defendants any money and filed a law suit to start the defense for their part of the two breached contracts in the United States District Court for the Eastern District of Virginia, Case Number: 01:04cv1379 in November, 2004.

25. That due to some unusual circumstances in that case which is still being investigated by the proper authorities, Plaintiffs filed to vacate the case in Virginia when Defendants Sidney S. Friedman, Greg I. Rose, and Weinstock, Friedman & Friedman, P.A. filed to enforce the judgment for Yelin Shi and Yu Fan in the Circuit Court for Montgomery County, Maryland. Plaintiffs aver that these two U.S. District Court cases will not be resolved until the formal complaint has been thoroughly addressed with the Judicial Conference and the Attorney General of the United States has completed the investigation. Plaintiffs have hired a law firm to represent them in these proceedings.

26. That due to the involvement of a third party in Canada named Vijay Patel who is a defendant in *Samuel K. Jacobs, et al v. Vijay Patel, et al,* Case Number: 1:07cv1802 in this same Court, copies of the telephone conversations between Sidney S. Friedman and Vijay Patel are being

made by Homeland Security. Those recordings will prove that these Defendants are coconspirators in both cases and will expose the missing information to complete the investigation.

## IV. RICO—FEDERAL RULES OF CIVIL PROCEDURE: RULE 8 OR RULE 9 ?

27. That Plaintiffs state that at least two interstate telephone calls which Defendants made to Plaintiffs' office were heavy violations of the RICO statutes and the Consumer Protection Act, and are directly and indirectly connected to other RICO events, persons, and enterprises even though the calls may appear on the surface to be isolated events. However, the Plaintiffs aver that although the Defendants appear to have stopped the harassing telephone calls since the filing of this Complaint, those overt acts did occur and there is a continuity which is obvious from the relationship factor among the Defendants.

> Under a statute so providing, the offense is committed whether the threat is to injure the person or property of the individual threatened or that of any relative of his or any member of his family, or of any corporation of which he is an officer, stockholder, employee, or agent.[5] There contains no limitation with respect to the person as to whom the threat is made or the person from whom it is intended to extort the money, the threat may be made to anyone, either the person to be injured, the person from whom it is intended to extort the money, or to a different person.[6]

28. That Plaintiffs have joined these parties with the other Defendants to prove that the telephone calls proved a continuity alleged and actual previous RICO overt acts of the Defendants to prove the continuity of the RICO conspiracy and the relationship of the RICO persons involved. Plaintiffs were the "intended victims," and the Plaintiffs, their office staff, the office associates who are not related to the Plaintiffs or the Defendants, were the "actual victims."

29. That, therefore, even though the events and the parties seem unrelated, the fact that at least one of the RICO persons was associated with another RICO person, or RICO enterprise, who

---

[5] *People v. Lamm,* 54 N.E. 2d 374, 292 N.Y. 224.

[6] *Commonwealth v. Pelligrini,* 54 N.E. 552, 283 Mass. 300.

was part of a previous actual or alleged RICO enterprise is necessary to prove the continuity allegation even if wire fraud had never been one of the elements cited and used in the previously alleged RICO enterprises.

30. That what ties the entire RICO conspiracy together is the fact that the RICO persons through these multiple RICO enterprises have a main objective, and that objective is to discredit the Plaintiffs so much that the court is diverted from allowing the actual facts of these two breached contracts from being heard. The reason is quite simple: Defendants Sidney S. Friedman, Greg I. Rose, Weinstock, Friedman & Friedman, P.A., Yelin Shi and Yu Fan want to avoid paying a debt for the contracts for soy beans and for crude oil which the Defendants Yelin Shi and Yu Fan breached.

31. That in their attempt to avoid the responsibility for this debt, Defendants Yelin Shi and Yu Fan induced Defendants Sidney S. Friedman, Greg I. Rose, Weinstock, Friedman & Friedman, P.A. to represent them and over the period of time for these cases, the other Defendants not only defended Yelin Shi and Yu Fan, they joined them as RICO persons and formed new RICO enterprises. The objective, as stated by Defendant Sidney S. Friedman to Vijay Patel, is to eventually sue the Plaintiffs and attach furniture and paintings which the Defendants Yelin Shi and Yu Fan saw in Plaintiffs' previous residence and which they believe are quite valuable.

32. That the whole case goes back to the fraud committed by Defendants Yelin Shi and Yu Fan when they breached those two contracts.

33. That the contracts were not breached because of lack of funds, they were breached because that was the Defendants' intention from the beginning and that is a fraud. When the Defendants failed to capture the goods in China without paying for them, they were held accountable and that $140,000.00 became an issue to the Defendants Shi and Fan. There are no

private companies in The Peoples Republic of China and EVERY company is owned at least 50% by the Chinese government.

34. That Defendants have never admitted that they signed the contracts, and the letter Defendant Shi signed representing himself as a Director of the company that made the sales contract.

35. That the pleading stresses how these RICO violations were committed within the RICO enterprises by RICO persons. Can a Rule 8 (General Rules of Pleading) pleading succinctly cover all three of these elements in short paragraphs without losing the continuity element for the criminal acts?

## V. PLAINTIFFS' COMMITMENT TO PROVE RICO

36. That Plaintiffs aver that the civil RICO statutes are a different type of pleading altogether. The statutes from Title 18 U.S.C.A. § 1961 (Definitions) to Title 18 U.S.C.A. § 1968 (Civil Investigative demand) are referred to as the "civil RICO" statutes, but they are enacted under the criminal code section of the United States Code. Since the very essence of proving a RICO case is to tie each RICO person to at least one RICO enterprise. Congress enacted each RICO statute to be dependent upon the civil RICO definition described in Title 18 U.S.C.A. § 1961 (5) (Definitions) which cites approximately 45 statutes including Title 18 U.S.C.A. § 1956 (c)(7) (D) (Laundering of monetary instruments) which cites at least another 50 plus statutes which qualify as RICO violations.

37. That each act must interrelate to at least one other statute according to § 1961(5) which defines the repetition of these criminal acts as a "pattern of racketeering activity." The very word "pattern" indicates that there had better be more than one or two incidences to prove the "pattern of racketeering activity."

38. That by these definitions, the Plaintiffs have cited the multiple citations of the violations which support the plaintiffs' averments in order to establish the "pattern of racketeering activity." In addition to this, the Plaintiffs believe that they have proved that there is continuity or threat of continuity if the issues are not resolved. This usually involves the recitation of even more statutes to prove the continuity element.

39. That in addition to this, since some of the courts demand that the Plaintiffs must prove the difference between a RICO person and a RICO enterprise, they would be remiss if they failed to distinguish the definition of these two elements in this case.

40. That with all of this to consider, define, and prove, how can a RICO complaint not be a Rule 9 (Pleading Special Matters) pleading at all times? How does a plaintiff convert a cow into a rabbit? The facts are simply too much to shorten into "brief and concise" statements when to not sufficiently define just one element is RICO complaint suicide.

41. That the Plaintiffs believe that they have detailed the history of this case to the Court's satisfaction in order to understand the complex relationships, and incorporated the key elements of this case as pertains to this case even with references to the history. The Plaintiffs still maintain that the case might not have detailed the case succinctly enough for a new reader, but these Defendants are more than well aware of what actions were taken by them to have this case filed against all of them.[7]

---

[7] In the often-quoted words of Judge Pratt of the Second Circuit:
When Congress provided severe sanctions, both civil and criminal, for conducting the affairs of an "enterprise" through a "pattern of racketeering activity," it provided no exception for businessmen, for white collar workers, for bankers, or for stockbrokers. If the conduct of such people can sometimes fairly be characterized as "garden variety fraud," we can only conclude that by the RICO statute congress has provided an additional means to weed the "garden" of its fraud. . . . It seems almost too obvious to require statement, but fraud is fraud , whether it is committed by a hit man for organized crime or by the president of a Wall Street brokerage firm. *Furman v. Cirrito,* 741 F.2d

42. That the Plaintiffs can see where the Honorable Court is justifiably confused about this case and the various courts that have been involved in this cause of action although the original RICO enterprises and events did start in the District of Columbia in 1996. Plaintiffs state that because RICO is about the criminal acts which affect business, and the District of Columbia is the office and the base of the Plaintiffs' business; therefore, this business has a right to claim its residence in the District of Columbia and to file its complaints in this jurisdiction since the business conducts its interstate and foreign commerce from this office. These white collar crimes directly, and indirectly, adversely affected interstate and foreign commerce and that interference with their business has been detrimental to the business and its standing in the community.

43. That this case is directly and indirectly linked to past events which occurred in the District of Columbia with third parties, and the last two acts of racketeering activity have occurred within ten years after the prior commission of the last act pursuant to the requirements of Title 18 U.S.C.A. § 1961 (5) (Definitions)..

44. That Plaintiffs contend that the Defendants' conspiratorial pattern of racketeering have affected the rights of the business to make contracts, has diminished the reputation of the business within its own office building through the inducement to breach two contracts and the actual breach of two contracts with two different third party suppliers. Plaintiffs have been notified that one of these third party suppliers, the Cargill Corporation which is a major U.S. agra company, will be filing a lawsuit very soon against the Defendants and the Plaintiffs about their losses due to these breached contracts.

---

524, 529 (2d Cir 1984), *vacated in part on other grounds sub nom Joel v. Cirrito,* 473 U.S. 922 (1985).

45.    That to prove that the Cargill Corporation and Kolleman Associates, Rotterdam, Holland, is going to sue all of these parties would require the Plaintiffs to call the Cargill attorneys and ask them if they could supply a copy of their forthcoming lawsuit, and this would be a ridiculous action on the part of the Plaintiffs just to supply a factual allegation in this case. No one would make such a ludicrous move.

## VI. STATEMENT OF FACT

46. That the civil RICO conspiracy is defined pursuant to Title 18 U.S.C.A. § 1962(d) (Prohibited activities) and Plaintiffs aver that it was the evidentiary events, witnesses, and facts of the criminal conspiracy in violation of Title 18 U.S.C.A. § 1951 (Interference with commerce by threats or violence) which have lead to this Complaint.

47.    That in addition to precedents defining Title 18 U.S.C.A. § 1962(d) (Prohibited activities), Plaintiffs rely heavily upon the conspiracy statutes pursuant to: Title 18 U.S.C.A. § 241 (Conspiracy against rights), and Title 18 U.S.C.A. § 373 (Solicitation to commit a crime of violence).

48. That, in short, the crux of this Plaintiffs' Amended Complaint is to "complain" about the conspiracy of the Defendants and the criminal acts carried forth by each of the Defendants, and others, at different stages over a period of at least four, and in some cases, ten years. Plaintiffs assert that the overt and predicate acts committed by these Defendants which have greatly affected the Plaintiffs interstate and foreign commerce qualifies the case as a true RICO conspiracy.

49.    That Plaintiffs further aver that in furtherance of the conspiracy, the Defendants' individual and joint violations of the U.S. laws pertaining to: wire fraud, financial institution laws, threats of violence against the property of the United States by third party conspirators, the Fair

Debt Collection Practices Act, breach of contract, inducement to breach contract, and obstruction of justice are offenses against the United States.

50. That Plaintiffs allege that the actions of all Defendants were induced by economic as well as other motives or actions.

## A. CONSPIRACY

51. That the Supreme Court, in order to elucidate the statutory meaning of the RICO statutes, addressed the term *"to conspire"* as used in Title 18 U.S.C.A. § 1962 (d) (Prohibited activities) in *Salinas v. United States.*[8] Since 1985, the statutes and the legislative history have been given a liberal and expansive approach. The Court determined that when the Congress wrote the RICO statutes in 1969 and 1970, it intended that the phrase *"to conspire"* was to function in the *"conventional sense."* From the beginning, the Court evoked the "general rule" that *"[w]hen Congress uses well-settled terminology of criminal law, its words are presumed to have their ordinary meaning and definition."*

> In its conventional usage, a conspiracy may exist *"even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense"* [9] Moreover, under traditional conspiracy principles, the partners in the criminal pan must agree to pursue the same criminal objective and may allocate the work among themselves, *"yet each is responsible for the acts of each other."* [10] if conspirators have a plan that calls for some conspirators to perpetrate the crime and others to provide support, *"the supporters are as guilty as the perpetrators."* Id. Finally, the general dogma regarding conspiracy includes the concept that a person *"may be liable for conspiracy even though he [is] incapable of committing the substantive offense."* [11]

52. That, therefore, when the Plaintiffs accused the Defendants of a joint conspiracy, it was based upon the RICO cases on conspiracy as well as the term "conspires" as used in Title 18

---

[8] *Salinas v. United States*, 118 S.Ct. 469(1997).
[9] *Salinas v. United States*, 118 S.Ct. at 477 (1997).
[10] Id.
[11] CIVIL RICO PRACTICE MANUAL, Second Edition, by Paul A. Baptista, Wiley Law Publications, John Wiley & Sons, Inc., (1997).

U.S.C.A. § 1951 (Interference with commerce by threats or violence) and Title 18 U.S.C.A. § 2332b (Acts of terrorism transcending national boundaries). The "conventional usage" of conspiracy would also include Title 18 U.S.C.A. § 241 (Conspiracy against rights).

53. That Plaintiffs state that Defendants Sidney S. Friedman, and/or Greg I. Rose and other members of Weinstock, Friedman & Friedman, P.A., made the threatening and harassing telephone calls to the Plaintiffs' office on behalf of Defendants Yelin Shi and Yu Fan. even though Shi and Fan did not make the calls, they were aware of the plan and agreed to the facilitation of the overt acts through verbal and written commitments as well as payment to Defendants Sidney S. Friedman, Greg I. Rose, and Weinstock, Friedman & Friedman, P.A.

54. That on several occasions over a period of weeks in February, 2007, Defendants Sidney S. Friedman, and/or Greg I. Rose of Weinstock, Friedman & Friedman, P.A., telephoned the Plaintiffs' office and were told that the Plaintiffs were not there. These Defendants then proceeded to verbally abuse, harass and intimidate each of the two receptionists who answered the telephones by threatening to come to the office with a *"sheriff and take ALL of the office equipment and furniture"* in the office.[12] When removing the office equipment there would also be personal possessions belonging not only to the employees of the office, but other equipment and personal belongings of other persons and companies who also lease and share the same office space.

> It is essential that there be an attempt to extort money or property.[13] It is not essential, however, that it be obtained at the very time the threat is made,[14] and under some statutes the crime may be complete even though no money or property is ever actually obtained.[15]

---

[12] "Moreover, there is authority that the crime of threatening to injure is complete as soon as a threat is communicated to a third party, regardless of whether the intended victim ever knows of the plot to injure him." *Beard v. U.S.,* App., 535 A.2d 1373.

[13] *People v. Robinson,* 20 P.2d 369, 130 C.A. 664

[14] *Burleson v. State,* 96 S.W.2d 785, 131 Tex.Cr. 76.

[15] *O'Neil v. State,* 296 N.W. 96, 237 Wis. 391, 135 A.L.R. 719.

55.  That Plaintiffs assert that these overt acts of attempted and threatened violence through armed robbery and extortion ARE  criminal offenses under not only the RICO statutes pursuant to Title 18 U.S.C.A. § 1951 (Interference with commerce by threats or violence), Title 18 U.S.C.A. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity), Title 18 U.S.C.A. § 875(d) (Interstate communications), Title 18 U.S.C.A. § 880 (Receiving the proceeds of extortion), and Title 18 U.S.C.A. § 894 (Collection of extensions of credit by extortionate means) through ACTUAL and CONTINUOUS overt acts of  Title 18 U.S.C.A. § 1343 (Fraud by wire, radio, or television).

56.  That  Sheriffs  carry weapons and the furniture and equipment  do not belong to the Plaintiffs or the Defendants.  Robbery  complaints will be filed against these Defendants by other persons in the Plaintiffs' office if these threats are carried out.   These threats are direct violations of the Fair Debt Collection Practices Act of Title 15 U.S.C.A. § 1692d. (Harassment or abuse) and Title 15 U.S.C.A. § 1692e. (False or misleading representations).

57.  That Plaintiffs state that:

a) the Defendants Sidney S. Friedman and Greg I. Rose are the RICO persons who operate through a RICO enterprise within an other wise legitimate  business named Weinstock, Friedman & Friedman, P.A. and claim to be "debt collectors" which means that they are governed by Title 15 U.S.C.A. § 1601, et seq., which is commonly known as the Consumer Protection Act, the Truth in Lending Act, and the Fair Debt Collection Practices Act;

b)  said  Defendants  Friedman  and  Rose  (or  others  not  yet  known  within  Weinstock, Friedman & Friedman, P.A.) made the telephone calls to the Plaintiffs' office and on at least three occasions verbally abused the recipients of the telephone calls, and  made violent, threatening and harassing demands to these innocent persons which not only violates the RICO statutes pursuant to

Title 18 U.S.C.A. § 1951 (Interference with commerce by threats or violence), but is cited by Congress as a violation of Title 15 U.S.C.A. § 1692d. (Harassment or abuse) and § 1692e. (False or misleading representations). (See APPENDIX TO AMENDED COMPLAINT for these statutes).

c) the use of the telephone from the State of Maryland to the District of Columbia to commit these threatened attempts of extortion, robbery and extortion makes the telephone a device of interstate wire fraud pursuant to Title 18 U.S.C.A. § 1343 (Fraud by wire, radio, or television) and Title 18 U.S.C.A. § 875(b), (c), and (d) (Interstate communications). Wire fraud is alleged by many authorities to be the most common RICO component.[16]

58. **That, in short, and to fulfill the Rule 8 (General Rules of Pleading) objective, the Defendants:**

a) **made the harassing and threatening telephone calls in violation of Title 18 U.S.C.A. § 875 (Interstate communications) in order to collect an unlawful debt in violation of Title 15 U.S.C.A. § 1692d. (Harassment or abuse), and Title 15 U.S.C.A. § 1692c. (Communication in connection with debt collection), Title 18 U.S.C.A. § 1692e. (False or misleading representations), [17] since the object of the threats of violence, robbery and extortion involved equipment not belonging to the Defendants,**

b) **committed the overt acts of actual and attempted threats of violence, robbery and extortion,**

---

[16]

[17] Full copies of the statutes pursuant to the Fair Debt Collection Practices Act which apply to this case are attached in an APPENDIX TO AMENDED COMPLAINT before the Exhibits, and the pertinent sections are set in **bold print and underlined.**

c) repeatedly made these calls and executed  these threats through violent verbal attacks,

d) knowingly made these threats which violated multiple RICO and Consumer Protection Act laws,

e) were not innocent persons with clean hands since the Defendants knew that they were violating these laws since they refer to themselves as "debt collectors" and these laws govern this business genre,

f)  completed these multiple overt acts through wire fraud by using the device of Defendants' choice to perpetrate the crimes, and, in RICO, each use of the telephone is a separate and complete act of wire fraud when it is used in a "scheme or artifice to defraud" as defined by Title 18 U.S.C.A. § 1346 (Definition of "scheme or artifice to defraud"), and,

g) when each and every act of wire fraud is proved, the  *"purpose of executing such scheme or artifice shall be fined under this title or imprisoned  not more than 20 years, or both."* Since the records are kept in Plaintiffs' office and there are at least two witnesses, the Plaintiffs cannot state the situation more simply than that—except maybe in the witnesses' depositions.

59.    That Defendants Sidney S. Friedman, Greg I. Rose, & Weinstock, Friedman & Friedman, P.A., Yelin Shi and Yu Fan have formed a conspiracy of enterprises which have initiated a pattern of racketeering activities which  transcends the predicate and overt acts so stated in the previous legal actions against Defendants Yelin Shi and Yu Fan. Also, in this mélange of conspirators is already added due to his mention in the July 10, 2008 Order, and his continued involvement with Defendant Sidney S. Friedman and Weinstock, Friedman & Friedman, P.A. on behalf of Defendants Yelin Shi and Yu Fan.

60. That on August 6, 2008, Vijay Patel telephoned Plaintiff Jacobs at 12:35 PM and stated that Patel's attorney, Defendant Sidney S. Friedman of Weinstock, Friedman & Friedman, P.A., had told him that he had won the case which had been filed against him in this Court, *Samuel K. Jacobs, et al v. Vijay Patel, et al*, Case Number: 1:07cv1802. Previously, Defendant Sidney S. Friedman stated in a deposition hearing that he had never heard of Vijay Patel when the Plaintiffs directly questioned him about he association.

61. That Plaintiffs have every reason to believe that the two men have constantly been recorded by the Homeland Security due to Vijay Patel's threats to help plant a bomb in Detroit, Michigan. During discovery the Plaintiffs will file an FOIA with Homeland Security to have those tapes presented as evidence of the constant communication that Vijay Patel claims to have with Sidney S. Friedman, Greg I. Rose, and Weinstock, Friedman & Friedman, P.A.

62. That Vijay Patel has revealed too much information about his conspiracy with Defendant Sidney S. Friedman through telephone conversations and e-mails sent to Plaintiff Samuel K. Jacobs which directly corresponds with the case in this Court. Defendants Sidney S. Friedman, Greg I. Rose, and Weinstock, Friedman & Friedman, P.A. to deny this implication, and the Homeland Security recordings will verify these allegations. Plaintiffs attach an e-mail from Vijay Patel to Plaintiff Samuel K. Jacobs which confirms the allegation of this conspiracy which has been continuous over a period of almost two years.

63. That Vijay Patel has further stated on the telephone that Sidney S. Friedman had told him what to write in response to the Complaint which had been filed against him by the Plaintiffs.

a) That Vijay Patel claims that Friedman is his lawyer and is defending or instructing him about the legal issues of the cases, and Freidman acts like he never heard of him even when the

Plaintiffs were informed that the two had talked together the same week. If Sidney S. Friedman is defending Vijay Patel then why has he not filed an appearance in that case?

b) If Defendant Sidney S. Friedman is not defending Vijay Patel, and Vijay Patel is stating on the telephone or through written statements through the internet a recitation of the events as they occur in these cases, then Defendants Greg I. Rose, Weinstock, Friedman & Friedman, P.A., Yelin Shi and Yu Fan are truly conspiring through Defendant Sidney S. Friedman with Vijay Patel who is under the scrutiny of the Homeland Security. **There is no attorney client privilege in terrorism when the attorney denies that he is representing the defendant**.

64. That pursuant to Rule 8 (General Rules of Pleading), Plaintiffs aver the remedial way to treat the conspiracy relationships is to list the RICO persons involved in the RICO enterprises, to-wit:

*a. Yelin Shi and Yu Fan for breach of contract and inducement of breach of contract:*

65. That Plaintiffs have already stated the ongoing issues concerning these two contracts.

*b. Yelin Shi and Chevy Chase Bank Employee:*

66. That Defendant Yelin Shi insisted that the Plaintiffs open an account in Chevy Chase Bank in 2003 through his Chinese friend, and through that bank employee, Yelin Shi was informed of not only the Plaintiffs' private and personal purchases, but the Plaintiffs' location through travel itineraries and hotel bills after the Plaintiffs left their residence in Potomac, Maryland. When the bank employee would tell Defendant Yelin Shi this information, Shi would call and tell them in what hotel they were lodged and threaten to come "see them." Plaintiffs assert that this is a serious violation of the laws governing BANKS AND BANKING, Title 12 U.S.C.A. § 208.62 (1) Suspicious activity reports.

*c. Yelin Shi and "Associate":*

67. That Yelin Shi more than once told Plaintiff Samuel K. Jacobs that he was a kickboxer and could kill him. Yelin Shi threatened Plaintiff Jacobs that he could hire a Chinese hit man to kill him for $5,000.00, and would stalk the Plaintiffs' previous residence by sitting for hours in his parked Navigator on the street directly behind the Plaintiffs' house while peering through the windows of their house with his "associate." Yelin Shi physically came to the school of the Plaintiffs' grandchild in Rockville, Maryland, ran up to where the child was being loaded into a car, and threatened to kidnap her. Plaintiffs are attaching a copy of that police report and can obtain an Affidavit from the witness to that threatened or attempted kidnapping.

68. That Police reports are filed in Montgomery County, Maryland, about the parked car behind the Plaintiffs' then residence and if the Court desires proof of this allegation, the Plaintiffs will request a copy of that police report.

*d. Yelin Shi, Yu Fan, Sidney S. Friedman, Greg I. Rose, & Weinstock, Friedman & Friedman, P.A.:*

69. That Yelin Shi and Yu Fan hired Sidney S. Friedman, Greg I. Rose, Weinstock, Friedman & Friedman, P.A. to defend them for this breach of contract lawsuit filed by the Plaintiffs in Virginia. Yelin Shi and Yu Fan filed a counterclaim for $140,000.00 in defense of their debt for these two contracts for which losses of more than $20,000,000.00 were incurred by the Plaintiffs and third party suppliers. The third parties which lost the shipment of soy beans due to spoilage because of this breach of contract are now claiming amounts to a total of more than $10,000,000.00 which is more than the original amount demanded for this lawsuit. This lawsuit will probably not be filed in the District of Columbia or the State of Maryland until after the civil suits are settled and the criminal indictments are issued. The breach of contract lawsuit for the expenses for the oil contract has not surfaced yet.

70.    That once Defendants Sidney S. Friedman, Greg I. Rose,  Weinstock, Friedman &

Friedman, P.A. entered the case, Sidney S. Friedman became the RICO person in control of the

original conspiracy of Yelin Shi and Yu Fan, and Sidney S. Friedman and  Greg I. Rose, through

Weinstock, Friedman & Friedman, P.A. conducted the actions of the multiple RICO conspiracies,

and formed new ones.[18]

**e. Sidney S. Friedman, Greg I. Rose,  Weinstock, Friedman & Friedman, P.A., Yelin Shi,  Yu**
**Fan, and Vijay Patel:**

71.    That Plaintiff Samuel K. Jacobs is the Plaintiff in Case Number: 1:07cv1802 in this

Court against Vijay Patel and Dilip Patel. Since that case is in this Court, the Plaintiffs will only

suffice to say that this a case where these two men accrued expenses with a New York brokerage

firm which had arranged the financing for a new airline which the two men wanted to start in

Canada. Plaintiff Jacobs was to receive just expenses for arranging the financing and for consulting

on the proposed charter airline. Jacobs asked for no further compensation, and only demanded that

the brokerage firm be paid directly by Vijay Patel and Dilip Patel who stated that they had financial

statements to prove that they could afford the initial costs.

72.    That the financing for the charter airline was arranged by Plaintiff Jacobs through a

brokerage firm in New York, and was approved based upon Jacobs' previous good standing with

the brokerage firm for other successful ventures. Vijay Patel and Dilip Patel  lied about their own

financial records and about their financial arrangements for the venture with a financier from Dubai.

---

[18] In *United States v. Scotto*, 641 F.2d 47 (2d Cir 1980), cert. denied, 452 U.S. 961 (1981), the
Second Circuit fashioned a two-part test to determine what constitutes "conducting the activities of
an enterprise," holding that the  proper connection is established when "1)one is enabled to commit
the predicate offenses solely by virtue of [one's] position in the enterprise or involvement or control
over the affairs of the enterprise, or 2) the predicate offenses are related to the activities of that
enterprise."

73.  That after this debacle, Plaintiffs discovered that Vijay Patel had been deported from the United States and cannot return. Plaintiff Jacobs  discovered this when he asked Vijay Patel to meet him with the brokerage firm in New  York and deal with them directly. Vijay Patel then stated that he had been arrested and spent three days in jail for beating his wife.

74.  **That in the course of the conversations made after the arrangements were made, Vijay Patel and one of his associates  in Canada named Sir stated that once the airline was running, they could bomb Detroit and Montreal. After that conversation in 2006, Vijay Patel was considered a person of interest by the NSA, and every telephone call made by Vijay Patel has been monitored  by Homeland Security.**

75.  **That because Defendant Friedman has produced documents which have made the Court doubt the Plaintiffs' veracity, the Plaintiffs are this week procuring the services of an attorney to file for a FOIA disclosure to obtain copies of the telephone calls made by Vijay Patel to Sidney S. Friedman at  Weinstock, Friedman & Friedman, P.A.   As the Court is aware, the telephone calls are recorded, and there has to be two people to transcribe the recordings and a supervisor present at all times during the transcript  procedure. Therefore, these documents could take considerable time to produce, and the Plaintiffs ask that the Court grant the necessary time to acquire the authentic copies of these telephone conversations.**

76.  That Vijay Patel has harassed and threatened the Plaintiffs repeatedly through telephone calls and emails, and through the internet discovered personal and public information about the Plaintiffs including the case against Yelin Shi and Yu Fan. One year before this case was filed in this Court, Vijay Patel claimed that  Sidney S. Friedman, Greg I. Rose,  Weinstock, Friedman & Friedman, P.A., Yelin Shi and Yu Fan had "found" him and wanted to talk to him. After that, Vijay Patel related the details of his conversations with Sidney S. Friedman to the Plaintiffs through

telephone calls, messages, or emails. Vijay Patel then stated  that he discovered that Defendant Sidney S. Friedman was the attorney of record in the Virginia Court and contacted him since the attorney's telephone number is listed, but not Defendants Yelin Shi and Yu Fan.

## B.  DEBT COLLECTORS LIMITED BY FAIR DEBT COLLECTION PRACTICES ACT

77.  That the Defendants Yelin Shi and Yu Fan hired Defendants Sidney S. Friedman, Greg I. Rose,  and Weinstock, Friedman & Friedman, P.A. to defend them, and although the Defendants have every right to hire a counsel to defend them, these Defendants defended Shi and Fan by joining in the pattern of racketeering activities and forming new RICO enterprises in a continuity of the overt acts. Only one of those RICO enterprises is the subject of this Complaint.

*Collection of extensions of credit by extortionate means.*
Under a statute, the use of any extortionate means to collect any extensions of credit or to punish any person for the nonrepayment thereof is a criminal offense.[19]  In order to convict for collection of extensions of credit by extortionate means the state must prove not only that the creditor knowingly and voluntarily participated in act constituting the offense, but it must also prove that the creditor was aware that his participation was threatening to the debtor.[20]

78.  That when these telephone calls began to the Plaintiffs' office, the receptionist, Ms. B, said the man identified himself as Defendant Sidney S. Friedman and said that he stated that he was an "investigator,"  and, furthermore, she said he had implied  in a rather confused identification  that he was from the "Government."   She stated that Sidney S. Friedman did not identify himself as an attorney.

Where the theory of prosecution is larceny by extortion, proof that the accused compelled or induced another to part with property in instilling fear of future injury is necessary; but larceny by extortion does not require evidence of an actual ability to cause the threatened harm in the threatened manner, only that the person threatened believed that the accused possessed such an ability.[21]  However, there is also authority that unless the statute so

---

[19] *State v. Frustino*, App., 689 P.2d 547, 142 Ariz. 288.

[20] *State v. Frustino*, App., 689 P.2d 547, 142 Ariz. 288.

[21] *People v. Capparelli*, Super., 603 N.Y.S.2d 99, 158 Misc.2d 996.

provides, the person threatened need not actually have been put in fear,[22] it being sufficient if the threat is of such character as might reasonably have that result.[23]

79. That the receptionist stated that she was calling the Plaintiffs because she was so alarmed with his actions. Although he had called several times before, this time he had become extremely violent and abusive on the telephone. She further stated that she did not think that he was from the Government because as she stated: *"those Government people do not threaten anyone, they just call and identify themselves quite clearly with their names, their department, and their telephone numbers if the person they want to talk to is not there they leave a message. They never scream like that."*

Statutes frequently provide a punishment for the extortion of money or property through threats of injury to person or property or economic injury and will be given effect in accordance with their terms.[24] Threats of injury at the hands of third parties are punishable under such statutes.[25] It is not necessary that a weapon be used or exhibited in connection with such threats.[26] Such a statute has been construed as intended to include a threat to invade any right for the invasion of which an action in damages would lie for injury to the persons or property.[27] A threat to throw away property is a threat to cause damage to property for purposes of the offense of theft by extortion.[28] Furthermore, the term "property" as used in a statute prohibition injury to the property of another, with intent to extort money, encompasses an interest in a lawsuit.[29]

80. That, although the Plaintiffs are pro se, they are aware of the laws of the United States concerning the Fair Debt Collection Practices Act and when the first hysterical call was made to them by the receptionist in their office about Defendant Friedman's telephone tirades, Plaintiffs

---

[22] *People v. Robinson*, 20 P.2d 369, 130 C.A. 664; *People v. Percin*, 47 N.W.2d 29, 330 Mich. 94; *O'Neil v. State*, 296 N.W. 96, 237 Wis. 391, 135 A.L.R. 719.

[23] *People v. Robinson*, 20 P.2d 369, 130 C.A. 664.

[24] *People v. Hopkins*, 233 P.2d 948, 105 C.A.2d 708; *Peterson v. Mayo*, 65 So.2d 48.

[25] *Bush v. State*, 168 P. 508, 19 Ariz. 195.

[26] *Burleson v. State*, 96 S.W.2d 785, 131 Tex.Cr. 76.

[27] *Meek v. State*, 185 N.E. 899, 205 Ind. 102.

[28] *State v. Davis*, 839 P.2d 283, 115 Or.App. 711.

[29] *State v. Manthey*, App.., 487 N.W.2d 44, 169 Wis.2d 673, review denied 491 N.W.2d 768.

knew that the Defendants had not only overstepped the line for "debt collectors," they had committed criminal acts in the process.

> It is essential that there be an attempt to extort money or property.[30] It is not essential, however, that it be obtained at the very time the threat is made,[31] and under some statutes the crime may be complete even though no money or property is ever actually obtained.[32]

81. That Plaintiffs state that this is a violation of Title 15 U.S.C.A. § 1692d (Harassment or abuse) of the Fair Debt Collection Practices Act,[33] and Title 18 U.S.C.A. § 1343 (Fraud by wire, radio, or television). ("It has been held that a demand for a settlement of a civil suit between the parties is not extortion by threats, although the basis for such suit might also be grounds for a criminal charge."[34])

> "Racketeering," from the standpoint of coercion, usually takes the form of compelling, by the use of threats to person or property, a person to do or abstain from doing an act which such other person has the legal right to do or abstain from doing.[35]

82. That Plaintiffs assert that "debt collection" firms such as this are patting themselves on the back for abusing their "title" to threaten and intimidate the consumer public while knowing that they are in violation of the laws simply because very few people have the fortitude to retaliate in a court room due to lack of money to hire an attorney, or, mainly, the public has a lack of knowledge as to what their rights are when they are illegally harassed and threatened by these law license thugs.

83. That the "debt collector" Defendants Sidney S. Friedman, Greg I. Rose, Weinstock, Friedman & Friedman, P.A., became RICO persons who formed new RICO enterprises for the

---

[30] *People v. Robinson*, 20 P.2d 369, 130 C.A. 664

[31] *Burleson v. State*, 96 S.W.2d 785, 131 Tex.Cr. 76.

[32] *O'Neil v. State*, 296 N.W. 96, 237 Wis. 391, 135 A.L.R. 719.

[33] Title 15 U.S.C.A. § 1692d (Harassment or abuse). See *Appendix for Complaint*.

[34] *McMillen v. State*, 60 Ind. 216.

[35] *U.S. v. McGlone*, D.C.Pa., 19 F.Supp. 285.

benefit of Defendants Yelin Shi and Yu Fan, and others,  outside  of all of the original RICO enterprises concerning the two contracts. At this point, Sidney S. Friedman, Greg I. Rose, Weinstock, Friedman & Friedman, assumed control of the entire scope of RICO enterprises  and began to conduct all of the activities for the various RICO enterprises with the exception of the procurement of the funds from Yelin Shi and Yu Fan's Chinese "partners."

84. That the Plaintiffs believe that the facts of this case deserve the scrutiny of this court in order to stop these illegal procedures in violation of the Fair Debt Collection Practices Act. Plaintiffs are not naïve enough to believe that they are the only victims of these acts of harassment, threats and intimidation through violence which were displayed at least twice in their office.

85. That where is Defendants Sidney S. Friedman, Greg I. Rose,  Weinstock, Friedman & Friedman, P.A.'s proof that they do not engage in these practices of threats, intimidation and harassment every day as a manner of doing business as "debt collectors"? If this Court allows an FOIA to be granted, Plaintiffs, upon information and belief, aver that the Attorney General of the United States and the Attorney General of the State of Maryland will produce evidence of other victims so similarly situated.

> Statute defining offense of retaliation against prospective witness seeks to encourage citizen's participation without fear of retribution  in reporting criminal activities, testifying in official proceedings, or cooperation with government in criminal investigation. *Morrow v. State,* Cr.App., 862 S.W.2d 612.

86. That if the pattern of racketeering activities is confirmed by these Attorneys General, then  maybe they will be held accountable for their actions and  they will have more than a  hand slapping for violating the very laws which they  were sworn to uphold. A whole segment of society has suffered too long. The consumer is obligated to pay his debt, but he is not obligated to suffer

outrageous slings of misfortune through outright harassment, threats, and violence because he owes the debt.

87.  That Plaintiffs reiterate that it was the violations of the Consumer Protection Act and the Fair Debt Collection Practices Act which occurred over a period of time from 2004 to 2007 which lead to the filing of the Complaint in October, 2007. Plaintiffs based their right to file this Complaint pursuant to Title 18 U.S.C.A. § 1961(5) (Definitions) which defines the "pattern of racketeering activity."

88.  In addition to the foregoing constitutional violations, said Defendants did conspire to violate Federal statute Title 18 U.S.C.A. § 241 (Conspiracy against rights) by interfering with the Plaintiffs' right to conduct interstate and foreign commerce through the threats against the staff of the Plaintiffs' office by force or violence, and accomplished these goals by threats, intimidation, fraud, and deception in a pattern of racketeering activities through the specific violations of Title 18 U.S.C.A. § 1961 (Definitions) which cites Title 18 U.S.C.A. § 1951 (Interference with commerce by threats or violence); Title 18 U.S.C.A. § 1956(c)(7)(D) (Laundering of monetary instruments); Title 18 U.S.C.A. § 1343 (Fraud by wire, radio, or television);

89.  That Plaintiffs state that the acts performed by Defendants Sidney S. Friedman and/or Greg I. Rose, of  Weinstock, Friedman & Friedman, P.A. on behalf of Yelin Shi and Yu Fan through telephone calls to the Plaintiffs' office were violations of the Fair Debt Collection Practices Act and the Consumer Protection Act, and each one of the following laws supports this supposition:

A) Title 15 U.S.C.A. § 1692c. *Communication with the consumer generally*: Defendants Sidney S. Friedman, Greg I. Rose, and  any other representative of Weinstock, Friedman & Friedman, P.A. not known at this time, should never have contacted third persons on behalf of Yelin

Shi and Yu Fan in order to collect a post judgment judicial remedy. No communication should have been exchanged—according to this law. Defendant Friedman's actions were not "reasonably necessary"; in fact, they were demonstrably abhorrent to the debt collection laws. Said actions did not "invoke specified remedies which are ordinarily invoked by such debt collector or creditor" pursuant to (c) Ceasing communication.

> (b) *Communication with third parties*:
>     Except as provided in section 1692b of this title, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgment judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.
> (c) *Ceasing communication:*
>     If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt, except--
>> (1) to advise the consumer that the debt collector's further efforts are being terminated;
>> (2) to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor; or
>> (3) where applicable, to notify the consumer that the debt collector or creditor intends to invoke a specified remedy.

B) Title 15 U.S.C.A. § 1692d. ***Harassment or abuse***: (Please see APPENDIX TO AMENDED COMPLAINT for these laws.)

90.    This law is quite specific about the type of conduct permitted in the solicitation to collect a debt by a "debt collector," and, Defendants Sidney S. Friedman, Greg I. Rose, and Weinstock, Friedman & Friedman, P.A., on behalf of Yelin Shi and Yu Fan harassed, oppressed, and abused a person in the collection of a debt. Defendants used the threat of use of violence or other criminal means to harm the physical person, reputation, or property of any person by making those disparaging telephone calls specifically in violation of Section (1) of this law. The Defendants

used obscene or profane language or language the natural consequence of which is to abuse the

hearer or reader in direct violation of Section (2) of this law. One of these Defendants made some of

the telephone calls without properly identifying himself to the person who answered the call which

meant that he made the placement of the telephone calls without meaningful disclosure of the

caller's identity in violation of Section (6) of this law thus limiting the names of the defendants.

> **A debt collector may not engage in any conduct the natural consequence of which is to  harass, oppress, or abuse any person in connection with the collection of a debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:**
> **(1) The use or threat of use of violence or other criminal means  to harm the physical person, reputation, or property of any person.**
> **(2) The use of obscene or profane language or language the  natural consequence of which is to abuse the hearer or reader.**
> **(3) The publication of a list of consumers who allegedly refuse  to pay debts, except to a consumer reporting agency or to persons meeting the requirements of section 1681a(f) or 1681b(3) \1\ of this title.**
> (4) The advertisement for sale of any debt to coerce payment of the debt.
> (5) Causing a telephone to ring or engaging any person in  telephone  conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.
> **(6) Except as provided in section 1692b of this title, the  placement of telephone calls without meaningful disclosure of the caller's identity.**

92.   That the  Plaintiffs will state the criminal overt acts and RICO predicate acts for which

they have knowledge and/or proof which have occurred in this case and which are similar in scope

and affect against other victims so similarly situated. The   Plaintiffs will also file for the disclosure

of any other victims of Defendants Sidney S. Friedman, Greg I. Rose, and  Weinstock, Friedman &

Friedman, P.A.,  who are so similarly situated for violations of the Fair Debt Collection Practices

Act.

93.   That upon release of any information which substantiates the Plaintiffs allegations, a

petition will be filed to  beseech the Attorney General of the United States to initiate  a plan for

discovery to determine all others so similarly situated who could be victims of the RICO enterprises

encased within an otherwise legitimate business of a "debt collection" through the firm named

Weinstock, Friedman & Friedman, P.A. Defendant Yu Fan's company, BMI Realtors, will have to

wait until the necessary judicial committees in Congress have determined its contribution to a

pattern of racketeering activities.

> Congress enacted RICO as Title IX of Organized Crime Control Act of 1970 because it
> found that 18th and 19th Century jurisprudence was ineffective to combat white-collar crime
> and fraudulent behavior. The statute's Statement to Findings recognized that organized
> crime "is a highly sophisticated, diversified, and widespread activity that annually drains
> billions of dollars from America's economy by unlawful conduct and the illegal use of
> force, *fraud,* and corruption," that such activities "weaken the stability of the Nation's
> economic system, *harm innocent investors and competing organizations,* interfere with free
> competition, seriously burden interstate and foreign commerce, threaten domestic security,
> and undermine the general welfare of he Nation and its citizens" and that organized crime
> "continues to grow" because "the sanctions and remedies available to the Government are
> necessarily limited in scope and impact." 5-42, § 1962: Prohibited Conduct, December,
> 1992, McGraw-Hill.

94.    That Plaintiffs assert that this specific threat of repetition of fraud against not only

these Plaintiffs, but other victims of Defendants Sidney S. Friedman, Greg I. Rose, and, Weinstock,

Friedman & Friedman, P.A. extends indefinitely into the future, and thus, the requisite threat of

continuity is supplied. Plaintiffs are not alleging incidents off the top of their heads as a whim; each

overt act can be confirmed by the appropriate U.S. Government agency.

95.    That the Defendants Sidney S. Friedman, Greg I. Rose,  Weinstock, Friedman &

Friedman, P.A., Yelin Shi and Yu Fan are demanding a more definite statement because the

statements which Plaintiffs have made are legitimate. Defendants have a history of demanding Rule

8 (General Rules of Pleading) pleadings instead of Rule 9 (Pleading Special Matters) pleadings.

96.    That if the Plaintiffs did not define the events, enterprises, and persons involved, then

the Court would claim that the requirements for a RICO complaint had not been met and the case

would be dismissed. The very fundamentals of the RICO statutes dictate that the more remedial

requirements of Rule 8 (General Rules of Pleading) pleadings for a short and brief statement are contradictive to the objectives of Congress in enacting the white collar crime statutes.

97.  That Congress knew that the white collar crime offenders were too far above average in intelligence and education to be thwarted with oversimplified laws. Anyone smart enough to commit a white collar crime is smart enough to have thought of ways to find loopholes out of their predicament. [36]

98.  That as this Honorable Court is no doubt aware, the Department of Justice does not move with great haste when confirming the allegations and facts supporting a civil RICO Complaint. The investigation takes several years to conclude and must establish:

a) how the RICO persons who have participated in the RICO conspiracies and their relationship to each other in the total conspiracy and the interrelationship of the laws which pertain to establish this relationship;

b)  what contribution each RICO person made within each RICO enterprise to form the conspiracies, and what laws were violated in furtherance of the conspiracies through the particular RICO enterprises;

c) what overt and predicate acts were performed, how many times the criminal acts were performed and repeated by each RICO person in each RICO enterprise, how many RICO enterprises were established to perform these overt acts, and the list of RICO persons in each separate RICO enterprise;

---

[36] In *United States v Elliot*, 571 F.2d 880, 903 (5th Cir), *cert denied*, 439 U.S. 953 (1978), the Fifth Circuit observed that "the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise," and Rico applies to both insiders (officers, directors, controlling shareholders) an outsiders, those persons or entities such as accounting firms, **law firms,** lenders, and other providers of services, who participate directly or *indirectly* in the enterprise's affairs through a pattern of racketeering activity. *See* 18 USC § 1962(c). *Supra*, RICO In Business And Commercial Litigation by Kevin P. Roddy, at 5-26. (**Bold** emphasis added).

d) what RICO related statutes were violated, and any and all other criminal statutes might have been violated through RICO related statutes such as wire fraud, the non-RICO banking laws, and the Consumer Protection Act since there are criminal violations cited within the United States Code;

e) how the RICO persons formed different RICO enterprises to conduct and/or control the multiple RICO conspiracies; and,

f) how the RICO persons formed RICO enterprises within otherwise legitimate businesses in order to collect unlawful debts not only for the benefit of the other Defendants but in collusion with defendants in another case which was not directly related to this case until the conspiracy began between Vijay Patel and Sidney S. Friedman.

## C. RICO OVERT ACTS: THREATS OF FORCE AND VIOLENCE

### BANKING VIOLATIONS

99. That no sooner had Vijay Patel told the Plaintiffs that he was talking to Defendant Sidney S. Friedman of Weinstock, Friedman & Friedman, P.A., and revealing everything that he knew about the Plaintiffs including the Plaintiffs' bank account that was opened at Citibank after the fiasco at Chevy Chase Bank with Yelin Shi and Yu Fan's friend. This account was opened after the association with Defendants Yelin Shi and Yu Fan was ended, and Vijay Patel stated in messages on the answering machine, in e-mails, and on the telephone, that he had contacted Sidney S. Friedman and given him the Plaintiffs' banking and other information.

100. That this theft of the Plaintiffs' bank account information and identity was as much a crime as if Defendant Yelin Shi's friend at Chevy Chase Bank had allowed him to withdraw funds from the Plaintiffs' account. Plaintiffs aver that this is a direct violation of Title 18 U.S.C.A. § 657, (relating to theft, embezzlement, or misapplication by bank officer employee).

101.  That this invasion of the Plaintiffs' privacy was a clear violation of the Bank Secrecy Act since an employee of the bank conducted a series of criminal violations to inform Yelin Shi and Yu Fan not only the details of the Plaintiffs' bank account, but the whereabouts of the Plaintiffs after Defendant Yelin Shi had threatened the Plaintiffs' lives at  multiple times through various venues, and had threatened to kidnap or harm their grandchild.

102.   That there is a witness to the threatened kidnapping of the grandchild, and the Montgomery County Police approached Defendant Shi and another man when they were sitting in a parked car in the dark and  were just watching the Plaintiffs' movements through the windows in the back of the house where the  Plaintiffs were residing.

103.   That the bank employees' supply of information, part of which was recited on a telephone answering machine by Defendant Shi, directly involves Chevy Chase Bank in the violation of  not only the Plaintiffs' privacy about the bank account, but served as a real and present danger to the Plaintiffs' lives by informing Defendants Yelin Shi and Yu Fan about the hotels where they were residing. (See APPENDIX TO AMENDED COMPLAINT for the details of this banking law and the underlined part of the law which applies to this case.)

104.  That the Plaintiffs do not submit vexatious or perjurious information or averments in this Complaint. The Plaintiffs have witnesses to these events, and the police report about the Defendants' voyeurism was not even known to the Plaintiffs until after the event occurred since Defendant Shi's Navigator was parked on a hill looking down into the house and was hidden by the dark.

105.  That soon after Vijay Patel's revelations, Defendant Sidney S. Friedman, of Friedman & Friedman, P.A., filed a Writ of Garnishment of Property upon the Plaintiffs' Citibank bank account in the Circuit Court for Montgomery County, Maryland, fulfilling Vijay Patel's

announcement that he had conspired with these Defendants and given them the Plaintiffs' bank account information. Before Vijay Patel's announcement that he had informed Defendant Friedman about the Plaintiffs' bank account and other information, Defendants Sidney S. Friedman, Greg I. Rose, Weinstock, Friedman & Friedman, P.A., Yelin Shi and Yu Fan did not have the information about this bank account and could not have known the number since Vijay Patel obtained the information after Plaintiff Jacobs was robbed.

106.    That Vijay Patel's telephone messages, the e-mails, and the filing of the Writ of Garnishment of Property against the Plaintiffs' bank account with the correct account number was one link after another, and was probably the most incriminating evidence that Defendants could have perpetrated to support the Plaintiffs' allegations about the conspiracy with Vijay Patel. Thus, the conspiracy with Vijay Patel is complete.

107.    That all of the facts surrounding the previous events are necessary components to prove the extent and interrelationship of the Defendants' RICO conspiracies, the number of violations of the laws, which laws were violated, which Defendants participated in each event, and most importantly, every RICO case which claims continuity and repetition must prove that:

a) the conspiracies and the pattern of racketeering activities are ongoing, that they are repeated over a period of time and that *"at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years after the commission of a prior act of racketeering activity"* pursuant to Title 18 U.S.C.A. § 1961(5) (Definitions);

b) that the Plaintiffs have linked each of the events in this Complaint to at least one Defendant who is a RICO person who has joined at least one other RICO person in order to further the conspiracy *"through a pattern of racketeering activity or through collection of an unlawful debt*

*to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce"* pursuant to Title 18 U.S.C.A. § 1962(b) (Prohibited activities). The first lawsuit was about the fraudulent manner in which the breach of contracts was planned by Defendants Yelin Shi and Yu Fan.

c) that each of the Defendants is a RICO person who is associated with or employed *"by the enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of the enterprises' affairs through a pattern of racketeering activities or collection of an unlawful debt"* in violation of Title 18 U.S.C.A. § 1962(c) (Prohibited activities).

*VIOLATIONS OF FAIR DEBT COLLECTION PRACTICES ACT:*

108. That the Plaintiffs aver that it was the overt acts committed by Defendant Sidney S. Friedman, Greg I. Rose, Weinstock, Friedman & Friedman, P.A., in defense of Yelin Shi and Yu Fan that created the violations of the Fair Debt Collection Practices Act.

109. That Plaintiffs aver that this organization is a sordid segment of society. The actions of organizations such as these Defendants discredits the entire legal profession because they operate to commit more crimes against the people that they are, in effect, terrorizing with the theft of their credit reports and other private identity information which was given under duress if this type of credit collection is the result. This is not zealously defending a client, it is an enterprise which blatantly pursues a financial goal without a regard for ethics or legality.

110. That Plaintiffs allege that these Consumer Protection Act violations were committed through the RICO enterprises' generation of a pattern of racketeering activities which has a continuity which is evident in this lawsuit. The Plaintiffs are not naïve enough to believe that this

association of "debt collectors" has limited itself to just these Plaintiffs.[37] The staff is too large, and the arrogance of the actors denotes that this is a typical manner of operation for these Defendants. ("to be convicted of a RICO conspiracy, a defendant must agree only to the commission of the predicate acts, and need not agree to commit personally those acts." *United States v. Adams,* 759 F.2d 1099 (3rd Cir), cert. denied, 474 U.S. 906, 971 (1985)).

111.  That most of the these "debt collector" culprits hide behind 800 numbers which forbid a call back to identify the company and its location, credit card calling numbers, and other truly felonious numbers which hide the identity of these "debt collectors" and their location. The criminal acts and the antics which are performed by these firms which refer to themselves as "debt collectors" are a blight on the companies that hire them.

112.  That when Defendant Sidney S. Friedman     committed these criminal acts of telephoning the Plaintiffs' office and threatening to come with a Sheriff and take ALL of the office equipment in the large office shared by others, he was supported by Defendants Greg I. Rose, Weinstock, Friedman & Friedman, P.A., Yelin Shi and Yu Fan. Defendants Yelin Shi and Yu Fan allocated the work to Sidney S. Friedman, Greg I. Rose,  Weinstock, Friedman & Friedman, P.A.

113.  That the ease by which Defendant Sidney S. Friedman called and threatened the receptionist at the Plaintiffs' office, and the number of complaints filed with the Attorney General against him and his firm on behalf of his other clients denotes that this is not the first time that Defendant Freidman had used these tactics of threats and intimidation which he knows are in violation of the very laws by which he attempts to act as a "debt collector."

---

[37] "Association does not require that the defendant be employees by or legitimately  connected to the racketeering enterprise." *United States v. Mokol,* 957  F.2d 1410, 1417 (7th Cir 1992).

114.    That Defendants Sidney S. Friedman, Greg I. Rose, and Weinstock, Friedman &
Friedman, P.A., use the laws[38] to collect the money and somehow overlook the parts of the statutes
which forbid them to use threats, harassment, and extortion in order to collect these debts. Sidney S.
Friedman is a member of an organization of "debt collectors" which meets to discuss their business.
How many other  "debt collector" firms are using these same tactics in violation of these statutes?
As a former president of this group where he no doubt had to give at least one speech, how many of
these "debt collectors" has he advised to operate in the same manner?

115.    That the Plaintiffs will request that the Attorney General of the United States
investigate this group  to  determine what policies are being advocated in order to violate the laws
of the United States pursuant to Title 15 U.S.C.A. § 1601, et seq.

## VII.  CONCLUSION

116.    That a threat of bodily harm is neither an intrinsic distinction nor a necessary
association of the crime of extortion under the Hobbs Act (Title 18 U.S.C.A. § 1951 (Interference
with commerce by threats or violence).  Therefore, the fear element under the Act can be fulfilled
by threats other than threats of bodily harm or physical injury, such as by putting the victim in fear
of economic harm or loss; and the offense of extortion occurs under the Act when accused utilizes
or exploits a victim's reasonable fear of economic harm or loss.

117.    That the type of "debt collection" services practiced by the Defendants Sidney S.
Friedman, Greg I. Rose, & Weinstock, Friedman & Friedman, P.A. denotes an invasion of privacy
that extends beyond the reasonable norm for a legitimate business. Said "debt collection" practices
constitute extreme negligence and severe economic injury as revealed in this case.

---

[38] Title 15 U.S.C.A. § 1661, et seq.

118. That the Plaintiffs assert that the authorization for this type of legal business offends the very basis of the Citizens' fundamental constitutional rights pursuant to the:

119. **Article I, § 8, cl. 3** right to not have a State interfere with contracts of commerce which confer authority for the State to issue unWarranted liens and writs of attachment which are the result of the denial of **Amendment IV** rights *"against unreasonable searched and seizures"* and which, if such rights are convoluted by the State, deprive the Citizen of his or her **Amendment V** and **Amendment XIV** rights to not *"be deprived of life, liberty, or property, without due process of law;..."* which, if denied, nullify the Citizen's **Amendment VII** *"right of trial by jury shall be preserved,"* without which there are no guarantees to each Citizen of his or her **Amendment XIV** right to not be denied the jurisdiction for *"the equal protection of the laws."*

120. That the constitutional rights are all stated separately, but if one is violated they all are denied. This is indeed a most complex case due to the extent of the constitutional violation and criminal acts which have been perpetrated in multiple States. There must be one judicial authority which can take control of these cases and consolidate the facts. Otherwise, the Plaintiffs will never have a remedy at law which will completely close this case and the complaints will go on ad infinitum.

121. Therefore, the Plaintiffs have the right to claim relief pursuant to Title 18 U.S.C.A. § 1964 (Civil remedies).

> . . .*due to the fungibility of money, it is sufficient to prove that the funds in question came from an account in which tainted proceeds were commingled with other funds. As the Tenth Circuit noted, to rule otherwise would defeat the very purpose of the money laundering statutes. It is unnecessary to attempt to segregate in some manner the tainted funds from the commingled account.*[39]

---

[39] *United States v. Garcia*, 37 F.3d 1359, 1365 (9th Cir. 1994), cert. Denied, 115 S.Ct. 1699 (1995). See also, *United States v. English*, 92 F.3d 909, 916 (9th Cir. 1996) (follows *Garcia*).

122. *That the Plaintiffs ask the Court how can a party make a case for fraud in a RICO case without:*

*a) detailing all of the events which lead to the fraud and how each party conspired to commit the violate the laws to accomplish the fraud;*

*b) defining ALL, not just some, of the laws which were violated in the commission of the frauds, and, in a RICO case:*

*(i) the relationship of one law to another which completes or continues the pattern of racketeering activities,*

*(ii) the participation of each defendant in the violation of each law which defines the person and the enterprises to accomplish the goals of the conspiracy,*

*(iii) the relationship of each defendant to the other defendants in the commission of the conspiracies, and,*

*(iv) the conspiracies' enterprises which committed the actual or attempted collection of the unlawful debt in violation of the RICO statutes?*

123. That the Plaintiffs would like to know: what part of this above equation can be eliminated and the stringent, not basic, requirements for a RICO complaint still be met?

## VIII. PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully request that this Honorable Court find the interpretation of the law as enacted by Congress pursuant to the Constitution of the United States and the statutes enacted pursuant thereof; and,

FURTHERMORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against the Defendants as follows:

    a.    That the granting compensatory damages in an amount to be proven at trial but at least $6,230,000.00 dollars plus all trial costs, and trebling such damages pursuant to Title 18 U.S.C. § 1964 (c) and (d);

    b.    That all costs for the time lost in the last three years which events have lead to the disruption, failure, and stoppage of the interstate and foreign commerce of the Plaintiffs' business, be granted in the amount of $3,000,000.00;

    c. That an award be granted to the Plaintiffs of all reasonable fees for legal costs in access of $62,000.00, and all costs for the preparation of this complaint;

    d.    That a finding that the Defendants Sidney S. Friedman, Greg I. Rose, Weinstock, Friedman & Friedman, P.A.,Yelin Shi, and Yu Fan, through their multiple enterprises, corporations, entities, associations-in-fact, and others not so named in this complaint, estop them from raising any affirmative defenses to this action;

    e.    That the Defendants Sidney S. Friedman, Greg I. Rose, Weinstock, Friedman & Friedman, P.A., Yelin Shi and Yu Fan, their multiple subsidiary enterprises, and associates, known and unknown, should for the sake of public policy and to prevent further violations of the law, have orders issued *"imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce"* pursuant to Title 18 U.S.C. § 1964 (Civil remedies)(a);

    f.    That Defendants be directed to submit all evidence, documents, publications, contracts, and other communications in their possession to the Plaintiffs, or their attorney, as alleged in this complaint by the Plaintiffs pursuant to the Federal Rules of Civil Procedure Rule 26;

g. That the Court  direct any further actions and orders against the Defendants as it may deem appropriate, but  not known to the Plaintiffs as of filing of this complaint, pursuant to Title 28 U.S.C. § 1651 (Writs), and § 1361 (Action to compel an officer of the United States to perform his duty);

h. Such other and further relief as the Court deems proper.

i. Plaintiffs preserve the right to amend this complaint upon information and evidence to be obtained which will affect the outcome of this litigation upon approval of the Court after responsive pleadings have been filed, but before responsive pleadings have been filed pursuant to Rule 15 of the Federal Rules of Civil Procedure.

## IX.  TRIAL BY JURY

Plaintiffs demand a trial by jury pursuant to Amendment VII of the Constitution of the United States and  Federal Rules of Civil Procedure Rule 38 (b). Also, Title 28 U.S.C.A. § 2072 (Rules of procedure and evidence; power to prescribe) COMMENTARY ON 1988 AND 1990 REVISIONS—'Federal Rule—Making Procedure Altered'—Paragraph 3: *". . .Also in that paragraph was the direction that the rules not impair the right to trial by jury guaranteed by the Seventh Amendment. **That direction is omitted, but without moment: no reminder is needed that neither a rule nor a statute can upset a constitutional requirement.**"*

Right to trial by jury in a civil RICO case exists because the Supreme Court of the United States has long upheld this right pursuant to the antitrust laws and precedents which carry such a right. *Fleitman v. Welsbach St. Lighting Co.*,  240 U.S. 27 (1916 ) (Holmes, J.). The right  to trial by  jury  is  derived  from  § 1964 (c).

Dated this 11th day of August, 2008.

Respectfully submitted,

Samuel K. Jacobs

Nancy Heckerman

OFFICE OF SAMUEL K. JACOBS
2300 M Street NW, Suite 838
Washington, D.C. 20037
Telephone: 202-416-1753
E-mail: sjnhjacobs@msn.com

# APPENDIX TO AMENDED COMPLAINT

## I. BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM :
PART 208—MEMBERSHIP OF STATE BANKING INSTITUTIONS IN THE FEDERAL
RESERVE SYSTEM (REGULATION H)    Subpart F—Miscellaneous Requirements

### *Title 12 U.S.C.A. § 208.62   Suspicious activity reports.*
(a) *Purpose.* This section ensures that a member bank files a Suspicious Activity Report when it
detects a known or suspected violation of Federal law, or a suspicious transaction related to a
money laundering activity or a violation of the Bank Secrecy Act. This section applies to all
member banks.
(b) *Definitions.* For the purposes of this section:
(1) *FinCEN* means the Financial Crimes Enforcement Network of the Department of the Treasury.
(2) *Institution-affiliated* party means any institution-affiliated party as that term is defined in 12
U.S.C. 1786(r), or 1813(u) and 1818(b) (3), (4) or (5).
(3) *SAR* means a Suspicious Activity Report on the form prescribed by the Board.
(c) *SARs required.* A member bank shall file a SAR with the appropriate Federal law enforcement
agencies and the Department of the Treasury in accordance with the form's instructions by sending a
completed SAR to FinCEN in the following circumstances:
**(1) *Insider abuse involving any amount.* Whenever the member bank detects any known or
suspected Federal criminal violation, or pattern of criminal violations, committed or
attempted against the bank or involving a transaction or transactions conducted through the
bank, where the bank believes that it was either an actual or potential victim of a criminal
violation, or series of criminal violations, or that the bank was used to facilitate a criminal
transaction, and the bank has a substantial basis for identifying one of its directors, officers,
employees, agents or other institution-affiliated parties as having committed or aided in the
commission of a criminal act regardless of the amount involved in the violation. (EMPHASIS
ADDED).**

### *Title 12 U.S.C.A. § 1818 – Termination of status of insured bank.*
**Whenever the Board of Directors shall find that an insured bank or its directors or trustees
have engaged or are engaging in unsafe or unsound practices in conducting the business of
such bank, or is in an unsafe or unsound condition to continue operations as an insured bank,
or violated an applicable law, rule, regulation or order, or any condition imposed by writing
by the Corporation in connection with the granting of any application or other request by the
bank, or any agreement entered into with the Corporation in connection with the granting of
any application to other request by the bank, or any agreement entered into with the
Corporation, the Board of Directors shall first give to the Comptroller of the Currency in the
case of a national bank or a district bank, to the authority having supervision of the bank in
the case of a State Bank, and the Board of Governors of the Federal Reserve System in the
case of a State member bank, a statement with respect to such practices or violations for the
purpose of securing the correction thereof and shall give a copy thereof to the bank.**

## II.  TITLE 15--COMMERCE AND TRADE:
   CHAPTER 41--CONSUMER CREDIT PROTECTION
   SUBCHAPTER IV--EQUAL CREDIT OPPORTUNITY

*Title 15 U.S.C.A. § 1691e. Civil liability*
**(a) Individual or class action for actual damages**
   **Any creditor who fails to comply with any requirement imposed under  this subchapter shall be liable to the aggrieved applicant for any  actual damages sustained by such applicant acting either in an  individual capacity or as a member of a class.**

**(b)  Recovery  of  punitive  damages  in  individual  and  class  action  for    actual  damages; exemptions; maximum amount of punitive damages in individual actions; limitation on total recovery in class
actions; factors determining amount of award.**
   Any creditor, other than a government or governmental subdivision or  agency, who fails to comply with any requirement imposed under this  subchapter shall be liable to the aggrieved applicant for punitive damages in an amount not greater than $10,000, in addition to any actual damages provided in subsection (a) of this section, except that in the case of a class action the total recovery under this subsection shall  not exceed the lesser of $500,000 or 1 per centum of the net worth of the creditor. In determining the amount of such damages in any action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional.

**(c) Action for equitable and declaratory relief**
   **Upon application by an aggrieved applicant, the appropriate United States district court or any other court of competent jurisdiction may grant such equitable and declaratory relief as is necessary to enforce the requirements imposed under this subchapter.**

(d) Recovery of costs and attorney fees.
   In the case of any successful action under subsection (a), (b), or (c) of this section, the costs of the action, together with a reasonable attorney's fee as determined by the court, shall be added to any damages awarded by the court under such subsection.

(e) Good faith compliance with rule, regulation, or interpretation of  Board or interpretation or approval by an official or employee  of Federal Reserve System duly authorized by Board
   No provision of this subchapter imposing liability shall apply to any act done or omitted in good faith in conformity with any official rule, regulation, or interpretation thereof by the Board or in conformity with any interpretation or approval by an official or employee of the Federal Reserve System duly authorized by the Board to issue such interpretations or approvals under such procedures as the Board may prescribe therefor, notwithstanding that after such act or omission has occurred, such rule, regulation, interpretation, or approval is amended, rescinded, or determined by judicial or other authority to be invalid for any reason.

**(f) Jurisdiction of courts; time for maintenance of action; exceptions**

**Any action under this section may be brought in the appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction. No such action shall be brought later than two years from the date of the occurrence of the violation, except that--**

(1) whenever any agency having responsibility for administrative enforcement under section 1691c of this title commences an enforcement proceeding within two years from the date of the occurrence of the violation,

**(2) whenever the Attorney General commences a civil action under this section within two years from the date of the occurrence of the violation, then any applicant who has been a victim of the discrimination which is the subject of such proceeding or civil action may bring an action under this section not later than one year after the commencement of that proceeding or action.**

(g) Request by responsible enforcement agency to Attorney General for civil action

The agencies having responsibility for administrative enforcement under section 1691c of this title, if unable to obtain compliance with section 1691 of this title, are authorized to refer the matter to the Attorney General with a recommendation that an appropriate civil action be instituted. Each agency referred to in paragraphs (1), (2), and (3) of section 1691c(a) of this title shall refer the matter to the Attorney General whenever the agency has reason to believe that 1 or more creditors has engaged in a pattern or practice of discouraging or denying applications for credit in violation of section 1691(a) of this title. Each such agency may refer the matter to the Attorney General whenever the agency has reason to believe that 1 or more creditors has violated section 1691(a) of this title.

(h) Authority for Attorney General to bring civil action; jurisdiction

When a matter is referred to the Attorney General pursuant to subsection (g) of this section, or whenever he has reason to believe that one or more creditors are engaged in a pattern or practice in violation of this subchapter, the Attorney General may bring a civil action in any appropriate United States district court for such relief as may be appropriate, including actual and punitive damages and injunctive relief.

(i) Recovery under both subchapter and fair housing enforcement provisions prohibited for violation based on same transaction

No person aggrieved by a violation of this subchapter and by a violation of section 3605 of title 42 shall recover under this subchapter and section 3612 \1\ of title 42, if such violation is based on the same transaction.

(j) Discovery of creditor's granting standards

Nothing in this subchapter shall be construed to prohibit the discovery of a creditor's credit granting standards under appropriate discovery procedures in the court or agency in which an action or proceeding is brought.

*Title 15 U.S.C.A. § 1692c. Communication in connection with debt collection*
(a) Communication with the consumer generally

Without the prior consent of the consumer given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may not communicate with a consumer in connection with the collection of any debt--

(1) at any unusual time or place or a time or place known or which should be known to be inconvenient to the consumer. In the absence of knowledge of circumstances to the contrary, a debt collector shall assume that the convenient time for communicating with a consumer is after 8 o'clock antemeridian and before 9 o'clock postmeridian, local time at the consumer's location;

(2) if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the consumer; or

(3) at the consumer's place of employment if the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communication.

**(b) Communication with third parties**

**Except as provided in section 1692b of this title, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgment judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.**

(c) Ceasing communication

If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt, except--

(1) to advise the consumer that the debt collector's further efforts are being terminated;

(2) to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor; or

(3) where applicable, to notify the consumer that the debt collector or creditor intends to invoke a specified remedy.

If such notice from the consumer is made by mail, notification shall be complete upon receipt.

(d) ``Consumer'' defined

For the purpose of this section, the term ``consumer'' includes the consumer's spouse, parent (if the consumer is a minor), guardian, executor, or administrator.

### Title 15 U.S.C.A. § 1692d. Harassment or abuse

A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The use or threat of use of violence or other criminal means to harm the physical person, reputation, or property of any person.

(2) The use of obscene or profane language or language the natural consequence of which is to abuse the hearer or reader.

(3) The publication of a list of consumers who allegedly refuse to pay debts, except to a consumer reporting agency or to persons meeting the requirements of section 1681a(f) or 1681b(3) \1\ of this title.

(4) The advertisement for sale of any debt to coerce payment of the debt.

(5) Causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.

(6) Except as provided in section 1692b of this title, the placement of telephone calls without meaningful disclosure of the caller's identity.

### Title 15 U.S.C.A. § 1691e. Civil liability

(a) Individual or class action for actual damages

Any creditor who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class.

(b) Recovery of punitive damages in individual and class action for actual damages; exemptions; maximum amount of punitive damages in individual actions; limitation on total recovery in class actions; factors determining amount of award

Any creditor, other than a government or governmental subdivision or agency, who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for punitive damages in an amount not greater than $10,000, in addition to any actual damages provided in subsection (a) of this section, except that in the case of a class action the total recovery under this subsection shall not exceed the lesser of $500,000 or 1 per centum of the net worth of the creditor. In determining the amount of such damages in any action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional.

(c) Action for equitable and declaratory relief

Upon application by an aggrieved applicant, the appropriate United States district court or any other court of competent jurisdiction may grant such equitable and declaratory relief as is necessary to enforce the requirements imposed under this subchapter.

(d) Recovery of costs and attorney fees

In the case of any successful action under subsection (a), (b), or (c) of this section, the costs of the action, together with a reasonable attorney's fee as determined by the court, shall be added to any damages awarded by the court under such subsection.

(e) Good faith compliance with rule, regulation, or interpretation of Board or interpretation or approval by an official or employee of Federal Reserve System duly authorized by Board

No provision of this subchapter imposing liability shall apply to any act done or omitted in good faith in conformity with any official rule, regulation, or interpretation thereof by the Board or in conformity with any interpretation or approval by an official or employee of the Federal Reserve System duly authorized by the Board to issue such interpretations or approvals under such procedures as the Board may prescribe therefor, notwithstanding that after such act or omission has occurred, such rule, regulation, interpretation, or approval is amended, rescinded, or determined by judicial or other authority to be invalid for any reason.

(f) Jurisdiction of courts; time for maintenance of action; exceptions

Any action under this section may be brought in the appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction. No such action shall be brought later than two years from the date of the occurrence of the violation, except that--

(1) whenever any agency having responsibility for administrative enforcement under section 1691c of this title commences an enforcement proceeding within two years from the date of the occurrence of the violation,

(2) whenever the Attorney General commences a civil action under this section within two years from the date of the occurrence of the violation, then any applicant who has been a victim of the discrimination which is the subject of such proceeding or civil action may bring an action under this section not later than one year after the commencement of that proceeding or action.

(g) Request by responsible enforcement agency to Attorney General for
    civil action

The agencies having responsibility for administrative enforcement under section 1691c of this title, if unable to obtain compliance with section 1691 of this title, are authorized to refer the matter to the Attorney General with a recommendation that an appropriate civil action be instituted. Each agency referred to in paragraphs (1), (2), and (3) of section 1691c(a) of this title shall refer the matter to the Attorney General whenever the agency has reason to believe that 1 or more creditors has engaged in a pattern or practice of discouraging or denying applications for credit in violation of section 1691(a) of this title. Each such agency may refer the matter to the Attorney General whenever the agency has reason to believe that 1 or more creditors has violated section 1691(a) of this title.

(h) Authority for Attorney General to bring civil action; jurisdiction

When a matter is referred to the Attorney General pursuant to subsection (g) of this section, or whenever he has reason to believe that one or more creditors are engaged in a pattern or practice in

violation of this subchapter, the Attorney General may bring a civil action in any appropriate United States district court for such relief as may be appropriate, including actual and punitive damages and injunctive relief.

(i) Recovery under both subchapter and fair housing enforcement provisions prohibited for violation based on same transaction

No person aggrieved by a violation of this subchapter and by a violation of section 3605 of title 42 shall recover under this subchapter and section 3612 \1\ of title 42, if such violation is based on the same transaction.

(j) Discovery of creditor's granting standards

Nothing in this subchapter shall be construed to prohibit the discovery of a creditor's credit granting standards under appropriate discovery procedures in the court or agency in which an action or proceeding is brought.

(k) Notice to HUD of violations

Whenever an agency referred to in paragraph (1), (2), or (3) of section 1691c(a) of this title--

(1) has reason to believe, as a result of receiving a consumer complaint, conducting a consumer compliance examination, or otherwise, that a violation of this subchapter has occurred;

(2) has reason to believe that the alleged violation would be a violation of the Fair Housing Act [42 U.S.C. 3601 et seq.]; and

(3) does not refer the matter to the Attorney General pursuant to subsection (g) of this section, the agency shall notify the Secretary of Housing and Urban Development of the violation, and shall notify the applicant that the Secretary of Housing and Urban Development has been notified of the alleged violation and that remedies for the violation may be available under the Fair Housing Act.

## *Title 15 U.S.C.A. § 1692f. Unfair practices*

**A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt.** Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

(2) The acceptance by a debt collector from any person of a check or other payment instrument postdated by more than five days unless such person is notified in writing of the debt collector's intent to deposit such check or instrument not more than ten nor less than three business days prior to such deposit.

(3) The solicitation by a debt collector of any postdated check or other postdated payment instrument for the purpose of threatening or instituting criminal prosecution.

(4) Depositing or threatening to deposit any postdated check or other postdated payment instrument prior to the date on such check or instrument.

(5) Causing charges to be made to any person for communications by concealment of the true purpose of the communication. Such charges include, but are not limited to, collect telephone calls and telegram fees.

(6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if--

    (A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;

    (B) there is no present intention to take possession of the property; or

    (C) the property is exempt by law from such dispossession or disablement.

(7) Communicating with a consumer regarding a debt by post card.

(8) Using any language or symbol, other than the debt collector's address, on any envelope when communicating with a consumer by use of the mails or by telegram, except that a debt collector may use his business name if such name does not indicate that he is in the debt collection business.

## Title 15 U.S.C.A. § 1692g. Validation of debts

(a) Notice of debt; contents

Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing--

    (1) the amount of the debt;

    (2) the name of the creditor to whom the debt is owed;

    (3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

    (4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

    (5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

(b) Disputed debts

If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) of this section that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector.

(c) Admission of liability

The failure of a consumer to dispute the validity of a debt under this section may not be construed by any court as an admission of liability by the consumer.

### *Title 15 U.S.C.A. § 1692h. Multiple debts*

If any consumer owes multiple debts and makes any single payment to any debt collector with respect to such debts, such debt collector may not apply such payment to any debt which is disputed by the consumer and, where applicable, shall apply such payment in accordance with the consumer's directions.

### *Title 15 U.S.C.A. § 1692i. Legal actions by debt collectors*

(a) Venue

Any debt collector who brings any legal action on a debt against any consumer shall--

(1) in the case of an action to enforce an interest in real property securing the consumer's obligation, bring such action only in a judicial district or similar legal entity in which such real property is located; or

(2) in the case of an action not described in paragraph (1), bring such action only in the judicial district or similar legal entity--

(A) in which such consumer signed the contract sued upon; or

(B) in which such consumer resides at the commencement of the action.

(b) Authorization of actions

Nothing in this subchapter shall be construed to authorize the bringing of legal actions by debt collectors.

### *Title 15 U.S.C.A. § 1692j. Furnishing certain deceptive forms*

(a) It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating.

(b) Any person who violates this section shall be liable to the same extent and in the same manner as a debt collector is liable under section 1692k of this title for failure to comply with a provision of this subchapter.

### *Title 14 U.S.C.A. § 1692k. Civil liability*

(a) Amount of damages

Except as otherwise provided by this section, any debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person in an amount equal to the sum of--

(1) any actual damage sustained by such person as a result of such failure;

(2)(A) in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000; or

(B) in the case of a class action, (i) such amount for each named plaintiff as could be recovered under subparagraph (A), and (ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector; and

(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court. On a finding by the court that an action under this section was brought in bad faith and for the purpose of harassment,

the court may award to the defendant attorney's fees reasonable in relation to the work expended and costs.

(b) Factors considered by court

In determining the amount of liability in any action under subsection (a) of this section, the court shall consider, among other relevant factors—

(1) in any individual action under subsection (a)(2)(A) of this section, the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional; or

(2) in any class action under subsection (a)(2)(B) of this section, the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, the resources of the debt collector, the number of persons adversely affected, and the extent to which the debt collector's noncompliance was intentional.

(c) Intent

A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

(d) Jurisdiction

An action to enforce any liability created by this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within one year from the date on which the violation occurs.

(e) Advisory opinions of Commission

No provision of this section imposing any liability shall apply to any act done or omitted in good faith in conformity with any advisory opinion of the Commission, notwithstanding that after such act or omission has occurred, such opinion is amended, rescinded, or determined by judicial or other authority to be invalid for any reason.

### *Title 15 U.S.C.A. § 1692m. Reports to Congress by the Commission; views of other Federal agencies*

(a) Not later than one year after the effective date of this subchapter and at one-year intervals thereafter, the Commission shall make reports to the Congress concerning the administration of its functions under this subchapter, including such recommendations as the Commission deems necessary or appropriate. In addition, each report of the Commission shall include its assessment of the extent to which compliance with this subchapter is being achieved and a summary of the enforcement actions taken by the Commission under section 1692l of this

(b) In the exercise of its functions under this subchapter, the Commission may obtain upon request the views of any other Federal agency which exercises enforcement functions under section 1692l of this title.

### Title 15 U.S.C.A. § 1692n. Relation to State laws

This subchapter does not annul, alter, or affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to debt collection practices, except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency. For purposes of this section, a State law is not inconsistent with this subchapter if the protection such law affords any consumer is greater than the protection provided by this subchapter.

### Title 15 U.S.C.A. § 1692o. Exemption for State regulation

The Commission shall by regulation exempt from the requirements of this subchapter any class of debt collection practices within any State if the Commission determines that under the law of that State that class of debt collection practices is subject to requirements substantially similar to those imposed by this subchapter, and that there is adequate provision for enforcement.

### Title 15 U.S.C.A. § 1681. Congressional findings and statement of purpose

(a) Accuracy and fairness of credit reporting

The Congress makes the following findings:

(1) The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

(2) An elaborate mechanism has been developed for investigating and evaluating the credit worthiness,\1\ credit standing, credit capacity, character, and general reputation of consumers.

(3) Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(4) There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

(b) Reasonable procedures

It is the purpose of this subchapter to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter.

# PETROLEUM FINANCIAL SERVICES CORPORATION

**6701 Democracy Boulevard      Suite 300**

**Bethesda, Maryland 20817**

**Telephone: 301-214-4020    Fax: 301-987-9462**

July 31, 2002

# PROFORMA OFFER

**1. Products:**  Please find the specifications for each kind of crude oil which is owned by us on the enclosed attachments.

**2. Price:**  CIF China. Price base "Platts Dubai" July, 2002, US $25.38 per barrel.

**3. Discounts:** Discount prices are US$3.00 below the "Platts Dubai" price.

**4. Valid:**  12 banking days.

**5. Payment:**  Irrevocable Confirmed Letter of Credit, payment at sight AFTER 30 (Thirty) days the vessel(s) arrives at a Chinese port per U.C.C. Rule 5.

Note:

Since we do only spot lifting, our purchase prices for the crude oil are subject to various price fluctuations. We use the Platts prices out of Singapore and Dubai. We buy the crude oil to our own account and resell it to major oil   companies throughout the world.

The crude oil comes from several sources in the Middle East and West Africa. Each year we sell 42,000,000 to 54,000,000 bbls. of crude oil and would like to include China in these sales for some or all of the spot lifting.

Please bear in mind that we only have 12 days from the time the offer for the spot lifting is given to procure a vessel; obtain the approval from the supplier's government to enter the country of origin; and open an irrevocable L/C to the primary producers of the crude oil.

Sincerely yours,

Jack Shi
Director
Petroleum Financial Services Corporation

**Exhibit A**

## PURCHASE AGREEMENT

This is a letter of Agreement by and between Samuel K. Jacobs and Jack Shi which reads as follows:

WHEREAS  Samuel K. Jacobs, 6701 Democracy Boulevard, Suite 300, Bethesda, Maryland 20817, (herein  called the  "SELLER"), has agreed to sell #2 soy beans GMO OR NON GMO  in the amount of 45,000 metric tons and   Jack Shi, 12 River Road, Potomac, Maryland 20854, (herein called the "BUYER"), has agreed to purchase this quantity.

For this and other valuable considerations in the amount of United States Ten Dollars ($10.00) SELLER AND BUYER agrees to the following terms and conditions:

**DEFINITIONS:**

1.0   "Inland charges" means charges to remove the grain from silos to train to include loading and unloading at the dock, any manual labor charges and the cost of using the machinery to load onto the vessel.

1.1   "F.O.B." in this agreement means all prices are based on warehouse storage facility. All prices are quoted  in this agreement based on F.O.B. basis only.

1.2   "F.A.S."  means freight along the side of the ship.

1.3   "C.I.F" means in this Agreement   that all conditions shall be according to the Uniform Commercial Code Rule 5. All prices quoted to include all domestic charges, loading charges, labor domestic charges at the port of embarkation; and,  insurance is to be covered from the time it leaves the storage until the freight arrives at the port of disembarkation and the BUYER  accepts the delivery.

1.4   "PAYMENT"   means a Irrevocable Letter of Credit issued by the BUYER acceptable to the SELLER and confirmed  by a major United States Bank which should be assignable and transferable.

1.5   "TERMS" means  terms and conditions stated  in the Letter of Credit by the BUYER.

1.6   "ACCEPTANCE" means the Letter of Credit issued by the BUYER must be acceptable to the SELLER and the Letter of Credit must be valid for 120 (one hundred twenty days) days. Only upon the receipt of the Letter of Credit, and if stated terms are acceptable to the SELLER, shall any and all information so required  be given to the BUYER. The Letter of Credit may be placed at a Bank at the sole discretion of the SELLER for collection at any time after the Bill of Lading is received by the shipping company with all the documents as stated in the Letter of Credit for payment at sight.

1.7  "CONFIRMATION" means in this Agreement SELLER will send a copy of the S.G.S. Certificate upon receipt of the Letter of Credit.
SECTION 1:

1.8  A fair and reasonable effort shall be made to provide accurate information for processing this order on the quality and specifications so provided by the S.G.S. If information received by the BUYER is not satisfied, the BUYER has the right to send notification to cancel the order within ten days after rejection of such report.

SECTION 2:

When used in the agreement the words and terms for which definitions are specified in the introductory paragraph of this agreement and the further articles of this agreement shall have the definitions respectively there ascribed to them.

SECTION 3:

There are no agents, no brokers, therefore, the terms of this agreement SELLERS agree to sell and will have the right and authority to perform what is stated in this agreement provided the BUYER has the capacity and ability to purchase the aforementioned soy beans. BUYER agrees and holds SELLER harmless from and against any lost, cost, expense, liability or claims of any kind or nature whatsoever arising from or in connection with the SELLER'S performance except in his duties of this agreement.

SECTION 4:

Approval of BUYER'S acceptance of the price. The purchase price of the soy beans is $206.00 (two hundred and six dollars) per metric ton F.O.B. New Orleans, Louisiana. If the BUYER disapproves this proposed contract, then BUYER must submit a revised contract. If any similar development is submitted with similar conditions under such circumstances then consideration shall be given to the new proposed agreement.

SECTION 5:

Disposition of goods. If the BUYER does not approve of this agreement the SELLER retains the right to otherwise sell or dispose all or substantially all of its purchases to other parties.

SECTION 6:

Distribution of expenses. Insurance, shipping freight charges to the People's Republic of China, inland freight charges, loading and unloading charges, and any other related inland charges shall be at the BUYER'S expense.

SECTION 7:

Liabilities. Charter party agreement does not apply to this agreement or any part of this agreement and the SELLER shall not be responsible for any discharge and or demurrage charges pursuant to this agreement.

SECTION 8:

Bond. Three per cent of the total value of the Letter of Credit shall be placed as a bond in favor of the BUYER as a performance guarantee only after the acceptance of the terms and conditions by the SELLER of the Letter of Credit.

SECTION 9:

Default. If the BUYER fails to open the Letter of Credit, this agreement becomes null and void thirty days after the signing of this agreement.

SECTION 10:

In the event of a dispute. In the event of a dispute in regard to this agreement the governing laws of the United States of America shall apply in regard to jurisdiction and venue. There shall be no arbitration. Since English is the international language of business, this contract shall remain in English since the purchase agreement has been formulated and performed in the United States of America.

SECTION 11:

Force Majeure or Acts of God. Neither party shall be held responsible for failure or delay to perform all or any part of this contract due to flood, fire, earthquake, snow storm, drought, hail storm, hurricane, monsoon, or any other event that is beyond the control of the affected party. In the event these conditions endure more than thirty days then the standard Force Majeure or Acts of God applies, and each party is to bare the responsibility for his own cost.

Dated this 28th day of August, 2002.

_____          _____
Samuel K. Jacobs                                         Jack Shi

# PETROLEUM FINANCIAL SERVICES CORPORATION

**6701 Democracy Boulevard     Suite 300**
**Bethesda, Maryland 20817**
**Telephone: 301-214-4020    Fax: 301-987-9462**

July 31, 2002

## PROFORMA OFFER

**1. Products:**  Please find the specifications for each kind of crude oil which is owned by us on the enclosed attachments.

**2. Price:**  CIF China. Price base "Platts Dubai" July, 2002, US $25.38 per barrel.

**3. Discounts:** Discount prices are US$3.00 below the "Platts Dubai" price.

**4. Valid:**  12 banking days.

**5. Payment:**  Irrevocable Confirmed Letter of Credit, payment at sight AFTER 30 (Thirty) days the vessel(s) arrives at a Chinese port per U.C.C. Rule 5.

Note:

   Since we do only spot lifting, our purchase prices for the crude oil are subject to various price fluctuations. We use the Platts prices out of Singapore and Dubai. We buy the crude oil to our own account and resell it to major oil   companies throughout the world.

   The crude oil comes from several sources in the Middle East and West Africa. Each year we sell 42,000,000 to 54,000,000 bbls. of crude oil and would like to include China in these sales for some or all of the spot lifting.

   Please bear in mind that we only have 12 days from the time the offer for the spot lifting is given to procure a vessel; obtain the approval from the supplier's government to enter the country of origin; and open an irrevocable L/C to the primary producers of the crude oil.

Sincerely yours,

Jack Shi
Director
Petroleum Financial Services Corporation

**Exhibit A**

## PURCHASE AGREEMENT

This is a letter of Agreement by and between Samuel K. Jacobs and Jack Shi which reads as follows:

WHEREAS  Samuel K. Jacobs, 6701 Democracy Boulevard, Suite 300, Bethesda, Maryland 20817, (herein called the "SELLER"), has agreed to sell #2 soy beans GMO OR NON GMO  in the amount of 45,000 metric tons and  Jack Shi, 12 River Road, Potomac, Maryland 20854, (herein called the "BUYER"), has agreed to purchase this quantity.

For this and other valuable considerations in the amount of United States Ten Dollars ($10.00) SELLER AND BUYER agrees to the following terms and conditions:

**DEFINITIONS:**

1.0   "Inland charges" means charges to remove the grain from silos to train to include loading and unloading at the dock, any manual labor charges and the cost of using the machinery to load onto the vessel.

1.1   "F.O.B." in this agreement means all prices are based on warehouse storage facility. All prices are quoted  in this agreement based on F.O.B. basis only.

1.2   "F.A.S." means freight along the side of the ship.

1.3   "C.I.F" means in this Agreement  that all conditions shall be according to the Uniform Commercial Code Rule 5. All prices quoted to include all domestic charges, loading charges, labor domestic charges at the port of embarkation; and,  insurance is to be covered from the time it leaves the storage until the freight arrives at the port of disembarkation and the BUYER  accepts the delivery.

1.4   "PAYMENT"   means a Irrevocable Letter of Credit issued by the BUYER acceptable to the SELLER and confirmed  by a major United States Bank which should be assignable and transferable.

1.5   "TERMS" means  terms and conditions stated  in the Letter of Credit by the BUYER.

1.6   "ACCEPTANCE" means the Letter of Credit issued by the BUYER must be acceptable to the SELLER and the Letter of Credit must be valid for 120 (one hundred twenty days) days. Only upon the receipt of the Letter of Credit, and if stated terms are acceptable to the SELLER, shall any and all information so required  be given to the BUYER. The Letter of Credit may be placed at a Bank at the sole discretion of the SELLER for collection at any time after the Bill of Lading is received by the shipping company with all the documents as stated in the Letter of Credit for payment at sight.

1.7   "CONFIRMATION" means in this Agreement SELLER will send a copy of the S.G.S. Certificate upon receipt of the Letter of Credit.
SECTION 1:

1.8   A fair and reasonable effort shall be made to provide accurate information for processing this order on the quality and specifications so provided by the S.G.S. If information received by the BUYER is not satisfied, the BUYER has the right to send notification to cancel the order within ten days after rejection of such report.

SECTION 2:

When used in the agreement the words and terms for which definitions are specified in the introductory paragraph of this agreement and the further articles of this agreement shall have the definitions respectively there ascribed to them.

SECTION 3:

There are no agents, no brokers, therefore, the terms of this agreement SELLERS agree to sell and will have the right and authority to perform what is stated in this agreement provided the BUYER has the capacity and ability to purchase the aforementioned soy beans. BUYER agrees and holds SELLER harmless from and against any lost, cost, expense, liability or claims of any kind or nature whatsoever arising from or in connection with the SELLER'S performance except in his duties of this agreement.

SECTION 4:

Approval of BUYER'S acceptance of the price. The purchase price of the soy beans is $206.00 (two hundred and six dollars) per metric ton F.O.B. New Orleans, Louisiana. If the BUYER disapproves this proposed contract, then BUYER must submit a revised contract. If any similar development is submitted with similar conditions under such circumstances then consideration shall be given to the new proposed agreement .

SECTION 5:

Disposition of goods. If the BUYER does not approve of this agreement the SELLER retains the right to otherwise sell or dispose all or substantially all of its purchases to other parties.

SECTION 6:

Distribution of expenses. Insurance, shipping freight charges to the People's Republic of China, inland freight charges, loading and unloading charges, and any other related inland charges shall be at the BUYER'S expense.

SECTION 7:

Liabilities. Charter party agreement does not apply to this agreement or any part of this agreement and the SELLER shall not be responsible for any discharge and or demurrage charges pursuant to this agreement.

SECTION 8:

Bond. Three per cent of the total value of the Letter of Credit shall be placed as a bond in favor of the BUYER as a performance guarantee only after the acceptance of the terms and conditions by the SELLER of the Letter of Credit.

SECTION 9:

Default. If the BUYER fails to open the Letter of Credit, this agreement becomes null and void thirty days after the signing of this agreement.

SECTION 10:

In the event of a dispute. In the event of a dispute in regard to this agreement the governing laws of the United States of America shall apply in regard to jurisdiction and venue. There shall be no arbitration. Since English is the international language of business, this contract shall remain in English since the purchase agreement has been formulated and performed in the United States of America.

SECTION 11:

Force Majeure or Acts of God. Neither party shall be held responsible for failure or delay to perform all or any part of this contract due to flood, fire, earthquake, snow storm, drought, hail storm, hurricane, monsoon, or any other event that is beyond the control of the affected party. In the event these conditions endure more than thirty days then the standard Force Majeure or Acts of God applies, and each party is to bare the responsibility for his own cost.

Dated this 28th day of August, 2002.

_____          _____
Samuel K. Jacobs                         Jack Shi

# UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA IN ALEXANDRIA

SAMUEL K. JACOBS, et al,

    PLAINTIFFS,

v.

YELIN SHI, et al,

    DEFENDANTS.

CASE NO: 1:07cv395

JUDGE: GBL/TRJ

## PLAINTIFF JACOBS' ANSWERS TO DEFENDANTS' INTERROGATORIES

COMES NOW the Plaintiff Samuel K. Jacobs who hereby states the following in answer to "Defendants' Interrogatories to Plaintiff Jacobs," to-wit:

1. INTERROGATORY 1:  Samuel K. Jacobs.

2. INTERROGATORY 2:  NA.

3. INTERROGATORY 3:  G.A.J. Dolk, Ludo Sauven, Carlos Vergist, and others in various companies associated with the Plaintiffs and Defendant Shi in Europe.

4. INTERROGATORY 4:  The documents are: a) On-board Bill of Lading; b) S.G. S. Certificates; c) Insurance Certificates; d) Inspection Certificate; and, e) Certificate of Origin.

5. INTERROGATORY 5: Exporters: Werner Bruckerhausen, Munich, Germany; Fred Trommeslauger, Bonn, Germany;

6. INTERROGATORY 6:  Damages are claimed by Kolleman Associates, Rotterdam, Holland, and its partners, who opened the Letter of Credit to purchase the goods for Yelin Shi to sell to China. Yelin Shi met attorney G.A.J. Dolk in Belgium, and Mr. Dolk stated the status of shipment and that he would act as a representative of both parties to consummate the transaction. Yelin Shi agreed to those conditions and signed the papers which were left in Mr. Dolk's possession. To

**Exhibit B**

eliminate the risk on the shipment, Kolleman Associates partners opened the Letter of Credit for both soy beans and crude oil. Kolleman Associates held Negotiable Bill of Lading, and shipment was made in this manner because Kolleman Meat Company was waiting for Irrevocable Letter of Credit to be issued pursuant to U.C.C. § 5-103(1)(a), by Jack Shi's associates in China through his brother. The Kolleman Associates obtained a Negotiable Bill of Lading from the shipping company because they wanted to control the product until Yelin Shi could provide his Irrevocable Letter of Credit and then the goods would be turned over to him which would eliminate the risk for the company.

This is a normal procedure to follow for overseas shipments. The reason that Kolleman Associates demanded Irrevocable Letter of Credit from China was because: 1) it can not be revoked; 2) Kolleman Associates wanted to assure themselves that Yelin Shi would issue Irrevocable Letter of Credit before they transferred the shipment to his company's name.

Yelin Shi presented a contract in English/Chinese which was illegible. Jacobs asked Shi to immediately translate the document into English so that he could send it to Kolleman Associates. Jacobs made agreements with Kolleman Associates after the meeting in Belgium to undertake the purchase of soy beans and crude oil. Now the transaction is incomplete as of November, 2004, last day to complete transaction, and the Kolleman Associates is going to sue for the breach of these contracts.

7. INTERROGATORY 7: Substance of this question is not clear. Question needs to be clarified for further response.

8. INTERROGATORY 8: Refer to "Plaintiffs' Brief for Pre-Trial Hearing," and the Plaintiffs' "Reply to Defendants' Pre-Trial Conference" for this answer.

9.  INTERROGATORY 9:  Issues have already been addressed at the Pre-Trial Hearing and in the pleadings.

10.  INTERROGATORY 10:  New evidence for a separate and independent cause of action are 'Exhibit B' which was attached to "Plaintiffs' Answer to Motion to Dismiss" and 'Exhibit A' which was attached to "Brief for Pre-Trial Hearing." Plaintiffs are not ready to present all newly discovered evidence for Case Number: 1:04cv1379, but there were averments and precedents in "Petition to Strike and Void Judgment" in paragraph 81, and, of course, paragraph 59 brings forth other issues. They rest will be presented at trial.

11.  INTERROGATORY 11: Plaintiffs have already stated in their pleadings, with precedents, that the Plaintiffs' signatures do not appear on either exhibit in Defendants' Counterclaim. (See paragraphs 59). Plaintiffs will support par. 66 with a plethora of precedents, if necessary, at trial.

12.  INTERROGATORY 12: The Plaintiffs have already made their statements in Court on July 25, 2007. This question is moot except for the evidence which will be presented eventually as a separate case.

13.  INTERROGATORY 13:  This evidence is tied together with the issues in the above Interrogatory 12.

14.  INTERROGATORY 14:  See Interrogatory 12 and 13.

15.  INTERROGATORY 15: This issue was presented in Court on July 25, 2007.

16.  INTERROGATORY 16: Defendants' "Answer and Counterclaim" where the attorneys, through the Defendants, stated that they did not have sufficient information to know if the Constitution of the United States was a legal or proper document for a  Federal Court. And, of course, the part where the attorneys, through the Defendants, denied ALL jurisdiction and venue for ALL Federal Courts.

17. INTERROGATORY 17: This is not a criminal case, and the Defendants are not the police. This is a silly question, is it not? Also, refer to Court transcript on July 25, 2007.

18. INTERROGATORY 18: Refer to Interrogatory 17.

19. INTERROGATORY 19: Plaintiffs were surprised that the case was being continued after an appeal was filed on August 1, 2005, and an amendment to that appeal, objecting to the bench trial.

20. INTERROGATORY 20: First of all, see Plaintiffs' Exhibit A and Exhibit B. Defendants committed to contracts for goods and services, with the Plaintiff, and then Shi thinks hta the walked away from the liability and debt, but the third parties are not going to buy that scenario in Europe. Because Jack Shi could not name a corporation in China, the Sellers asked for a negotiable Bill of Lading. A shipment made in this manner is known as a shipment and a reservation pursuant to U.C.C. § 2-505(1)(a). Because Yelin Shi breached a contract for sale, the action can be commenced against these parties (Shi and Jacobs) pursuant to U.C.C. § 2-725(2). (See Interrogatories 3, 4, 5, and 6.)

21. INTERROGATORY 21: Plaintiffs have submitted at least seven pleadings in three different courts about these issues.

22. INTERROGATORY 22: The attorneys, through the Defendants, denied the jurisdiction and venue in their own pleadings. This question was a mistake for Defendants to state in this Interrogatory when it was the Defendants who not only look like they lack knowledge of the laws, they committed a grievous criminal act and perjury against the United States.

23. INTERROGATORY 23: Before this question is answered  I need to have the following inquiries fulfilled:

(a) list of all persons, their addresses, birth dates, nationality, place of employment, and, if available, type of security clearance, who will have access to these documents;

(b) the names of the spouses, children, relatives, and their addresses, birth dates, security clearances, and place of employment, of the persons listed in (a);

(c) state the relevance of this inquiry to this case for the Department of Homeland Security, the Department of the Treasury, and the Federal Bureau of Investigation; and,

(d) completion of interviews and background investigations to be concluded by the aforementioned Departments or agencies stated in paragraph (c) concerning paragraphs (a) and (b).

Then I *might* answer   Interrogatory 23.

24. INTERROGATORY 24: This question was answered in the filing on August 13, 2007: "Reply to Defendants' Pre-Trial Brief."

25. INTERROGATORY 25: See Interrogatory 24.

26. INTERROGATORY 26:  Attorney Friedman knows that answer since has already called Plaintiffs' office and threatened the receptionists that he was going to come with the Sheriff and take all the furniture and equipment. This is a separate and independent cause of action as stated in Case Number: 1:07cv663.

27. INTERROGATORY 27:  Defendants are not ready for that answer. It is being presented under another type of action.

28. INTERROGATORY 28: Plaintiffs researched their position before filing the documents and the precedents concluded that the trial should have stopped when the bench trial was challenged for constitutional and other issues. Probably still one of the biggest RICO case on a constitutional question was *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, and, *United States v. Ward,* 448 U.S. 242, 249, 250. Plaintiffs were shocked when the Court ignored the Supreme Court decisions.

29. INTERROGATORY 29: Refer to Interrogatory 23.

30. INTERROGATORY 30: Refer to Interrogatory 23.

PLAINTIFF JACOBS' ANSWERS TO DEFENDANTS' INTERROGATORIES—Page 5 of 6

Dated this 14th day of August, 2007.

Respectfully submitted,

_____

Samuel K. Jacobs


OFFICE OF SAMUEL K. JACOBS
2300 M Street NW
Suite 838
Washington, D.C. 20037
Telephone: 202-416-1753
E-Mail: sjnhjacobs@msn.com
Fax: 202-293-3083

# UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA IN ALEXANDRIA

| | |
|---|---|
| SAMUEL K. JACOBS, et al, <br><br> PLAINTIFFS, <br><br> v. <br><br> YELIN SHI, et al, <br><br> DEFENDANTS. | CASE NO: <u>1:07cv395</u> <br><br> JUDGE<u>: GBL/TRJ</u> |

## PLAINTIFF HECKERMAN'S ANSWERS TO DEFENDANTS' INTERROGATORIES

COMES NOW the Plaintiff Nancy Heckerman who hereby states the following in answer to "Defendants' Interrogatories to Plaintiff Heckerman," to-wit:

1. INTERROGATORY 1: Nancy M. Heckerman.

2. INTERROGATORY 2: NA.

3. INTERROGATORY 3: G.A.J. Dolk, Ludo Sauven, Carlos Vergist, and others in various companies associated with the Plaintiffs and Defendant Shi in Europe.

4. INTERROGATORY 4: The documents are: a) On-board Bill of Lading; b) S.G. S. Certificates; c) Insurance Certificates; d) Inspection Certificate; and, e) Certificate of Origin.

5. INTERROGATORY 5: Exporters: Werner Bruckerhausen, Munich, Germany; Fred Trommeslauger, Bonn, Germany;

6. INTERROGATORY 6: Damages are claimed by Kolleman Associates, Rotterdam, Holland, and its partners, who opened the Letter of Credit to purchase the goods for Yelin Shi to sell to China. Yelin Shi met attorney G.A.J. Dolk in Belgium, and Mr. Dolk stated the status of shipment and that he would act as a representative of both parties to consummate the transaction. Yelin Shi agreed to those conditions and signed the papers which were left in Mr. Dolk's possession. To

eliminate the risk on the shipment, Kolleman Associates partners opened the Letter of Credit for both soy beans and crude oil. Kolleman Associates held Negotiable Bill of Lading, and shipment was made in this manner because Kolleman Meat Company was waiting for Irrevocable Letter of Credit to be issued pursuant to U.C.C. § 5-103(1)(a), by Jack Shi's associates in China through his brother. The Kolleman Associates obtained a Negotiable Bill of Lading from the shipping company because they wanted to control the product until Yelin Shi could provide his Irrevocable Letter of Credit and then the goods would be turned over to him which would eliminate the risk for the company.

This is a normal procedure to follow for overseas shipments. The reason that Kolleman Associates demanded Irrevocable Letter of Credit from China was because: 1) it can not be revoked; 2) Kolleman Associates wanted to assure themselves that Yelin Shi would issue Irrevocable Letter of Credit before they transferred the shipment to his company's name.

Yelin Shi presented a contract in English/Chinese which was illegible. Jacobs asked Shi to immediately translate the document into English so that he could send it to Kolleman Associates. Jacobs made agreements with Kolleman Associates after the meeting in Belgium to undertake the purchase of soy beans and crude oil. Now the transaction is incomplete as of November, 2004, last day to complete transaction, and the Kolleman Associates is going to sue for the breach of these contracts.

7. INTERROGATORY 7: Substance of this question is not clear. Question needs to be clarified for further response.

8. INTERROGATORY 8: Refer to "Plaintiffs' Brief for Pre-Trial Hearing," and the Plaintiffs' "Reply to Defendants' Pre-Trial Conference" for this answer.

9. INTERROGATORY 9: Issues have already been addressed at the Pre-Trial Hearing and in the pleadings.

10. INTERROGATORY 10: New evidence for a separate and independent cause of action are 'Exhibit B' which was attached to "Plaintiffs' Answer to Motion to Dismiss" and 'Exhibit A' which was attached to "Brief for Pre-Trial Hearing." Plaintiffs are not ready to present all newly discovered evidence for Case Number: 1:04cv1379, but there were averments and precedents in "Petition to Strike and Void Judgment" in paragraph 81, and, of course, paragraph 59 brings forth other issues. They rest will be presented at trial.

11. INTERROGATORY 11: Plaintiffs have already stated in their pleadings, with precedents, that the Plaintiffs' signatures do not appear on either exhibit in Defendants' Counterclaim. (See paragraphs 59). Plaintiffs will support par. 66 with a plethora of precedents, if necessary, at trial.

12. INTERROGATORY 12: The Plaintiffs have already made their statements in Court on July 25, 2007. This question is moot except for the evidence which will be presented eventually as a separate case.

13. INTERROGATORY 13: This evidence is tied together with the issues in the above Interrogatory 12.

14. INTERROGATORY 14: See Interrogatory 12 and 13.

15. INTERROGATORY 15: This issue was presented in Court on July 25, 2007.

16. INTERROGATORY 16: Defendants' "Answer and Counterclaim" where the attorneys, through the Defendants, stated that they did not have sufficient information to know if the Constitution of the United States was a legal or proper document for a Federal Court. And, of course, the part where the attorneys, through the Defendants, denied ALL jurisdiction and venue for ALL Federal Courts.

17. INTERROGATORY 17: This is not a criminal case, and the Defendants are not the police. This is a silly question, is it not? Also, refer to Court transcript on July 25, 2007.

18. INTERROGATORY 18: Refer to Interrogatory 17.

19. INTERROGATORY 19: Plaintiffs were surprised that the case was being continued after an appeal was filed on August 1, 2005, and an amendment to that appeal, objecting to the bench trial.

20. INTERROGATORY 20:  First of all, see Plaintiffs' Exhibit A and Exhibit B. Defendants committed to contracts for goods and services, with the Plaintiff, and then Shi thinks hta the walked away from the liability and debt, but the third parties are not going to buy that scenario in Europe. Because Jack Shi could not name a corporation in China, the Sellers asked for a negotiable Bill of Lading. A shipment made in this manner is known as a shipment and a reservation pursuant to U.C.C. § 2-505(1)(a). Because Yelin Shi breached a contract for sale, the action can be commenced against these parties (Shi and Jacobs) pursuant to U.C.C. § 2-725(2). (See Interrogatories 3, 4, 5, and 6.)

21. INTERROGATORY 21:  Plaintiffs have submitted at least seven pleadings in three different courts about these issues.

22. INTERROGATORY 22: The attorneys, through the Defendants, denied the jurisdiction and venue in their own pleadings. This question was a mistake for Defendants to state in this Interrogatory when it was the Defendants who not only look like they lack knowledge of the laws, they committed a grievous criminal act and perjury against the United States.

23. INTERROGATORY 23: Before this question is answered  I need to have the following inquiries fulfilled:

(a) list of all persons, their addresses, birth dates, nationality, place of employment, and, if available, type of security clearance,  who will have access to these documents;

(b) the names of the spouses, children, relatives, and their addresses, birth dates, security clearances, and place of employment, of the persons listed in (a);

(c) state the relevance of this inquiry to this case for the Department of Homeland Security, the Department of the Treasury, and the Federal Bureau of Investigation; and,

(d) completion of interviews and background investigations to be concluded by the aforementioned Departments or agencies stated in paragraph (c) concerning paragraphs (a) and (b).

Then I *might* answer   Interrogatory 23.

24.  INTERROGATORY 24: This question was answered in the filing on August 13, 2007: "Reply to Defendants' Pre-Trial Brief."

25.  INTERROGATORY 25: See Interrogatory 24.

26.  INTERROGATORY 26:  Attorney Friedman knows that answer since has already called Plaintiffs' office and threatened the receptionists that he was going to come with the Sheriff and take all the furniture and equipment. This  is a separate and independent cause of action as stated in Case Number: 1:07cv663.

27.  INTERROGATORY 27:  Defendants are not ready for that answer. It is being presented under another type of action.

28.  INTERROGATORY 28: Plaintiffs researched their position before filing the documents and the precedents concluded that the trial should have stopped when the bench trial was challenged for constitutional and other issues. Probably still one of the biggest RICO case on a constitutional question was *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, and, *United States v. Ward,* 448 U.S. 242, 249, 250. Plaintiffs were shocked when the Court ignored the Supreme Court decisions.

29.  INTERROGATORY 29: Refer to Interrogatory 23.

30.  INTERROGATORY 30: Refer to Interrogatory 23.

PLAINTIFF HECKERMAN'S ANSWERS TO DEFENDANTS' INTERROGATORIES—Page 5 of 6

Dated this 14th day of August, 2007.

Respectfully submitted,

_____

Nancy M. Heckerman

OFFICE OF SAMUEL K. JACOBS
2300 M Street NW
Suite 838
Washington, D.C. 20037
Telephone: 202-416-1753
E-Mail: sjnhjacobs@msn.com
Fax: 202-293-3083

# AFFIDAVIT  FOR COMPLAINT NUMBER: R04-036 339

## OFFICER ELIZABETH HOLT

I  declare under penalty of perjury, that to the best of my knowledge, the foregoing is true and correct.  Executed on JULY 4, 2004 (Date).

_____ (Print Name),

_____(Signature).

### I.

Samuel  K.  Jacobs  resides  at  13620  Canal  Vista  Court,  Potomac, Maryland 20854,  and is an advisor for Conflict Resolution to the Office of the President of the United States.

### II.

Jack Shi, who resides at 12922 River Road, Potomac, Maryland 20854, is a self declared Chinese Communist agent and  kickboxer who has stated more than once on the telephone and in person that he will pay $5000 for a hit man to commit murder-for hire against the Samuel K. Jacobs  and his family.

### III.

This  extortion route as adopted by Defendant Jack Shi is akin to the old Mafia extortion system which threatened defenseless small businesses with violent acts if they did not pay up for "protection."  This mobster is on the street  and  actually confronts his victims and threatens  to  kill  them  with kickboxing or to hire someone to do the job for $5000.

Exhibit C

IV.

In attempting to meet to talk about some previous business situations Jack Shi and Samuel K. Jacobs had made several appointments to meet and for one reason or another each one of the men had cancelled the appointments. On one occasion Jack Shi simply did not show up at the arranged meeting place while Jacobs waited for over 45 minutes. Last week they tried again to meet but Samuel K. Jacobs was called out of town on urgent business and had to cancel the appointment.

On July 4, 2004, at approximately 11:54 A.M. Jack Shi called and threatened Samuel K. Jacobs by stating that he wanted to take care of some business and that he wanted his boss, Chinese communist party leader Susan Wu, to be paid money. Samuel K. Jacobs stated that he would try again to meet him and asked when it would be convenient.

Jack Shi stated that Samuel K. Jacobs was a crook. Jacobs said that he would see Jack Shi in court to settle the matter.

Then Defendant Jack Shi stated to Samuel K. Jacobs that: *"I will hire hit man from Chinatown in New York to kill you and there is no way that they can get me for your murder since I am such a good boy in the community. I can buy police or anybody else in this country to do my dirty work so my hands stay clean. The Americans are such fools that they are easy to trick. They believe these acts of 'me no understand what you say.'"* Then he laughed.

Then Samuel K. Jacobs stated: *"See you in court!"*

The last words Defendant Jack Shi spoke to Samuel K. Jacobs were: *"I am going to cut your throat you son of a bitch."*

Jacobs hung up the phone.

Samuel K. Jacobs has every reason to believe that Jack Shi has already hired someone to kill him from previous statements such as the ones stated on July 4, 2004, and because he has been stalking the house and family of Samuel K. Jacobs.

V.

Plaintiff Samuel K. Jacobs called the Federal Bureau of Investigation within approximately forty-five minutes after the incident and reported the telephone call and what had occurred. The person on duty stated that the local police department should also be called since it was a holiday.

VI.

Plaintiff Samuel K. Jacobs called the Montgomery County Police Department and two officers came to the Plaintiff's house. The first officer was a man named Officer Washington, and about fifteen minutes later a lady officer named Elizabeth Holt appeared and she took down the report and gave the Plaintiff a calling card and a copy of the Complaint Number.

The officers stated that the Plaintiffs should file a complaint on Seven Locks Road with the District Court's office. After completing the Affidavit the Plaintiffs filed the report at 11:40 PM on July 4, 2003, but not the charges since they would remain in the State Court only.

VII.

Officer Holt then stated that she and Officer Washington would go to Defendant Jack Shi's house and talk to him.

VIII.

Officer Holt  came back to see the Plaintiffs on July 5, 2004 at 11:30AM to report that she had called upon Jack Shi and Yu Fan and to ask questions about their statements. She asked why the Plaintiffs had not filed the report with the District Court and the Plaintiffs produced the copies of the filings that they had been preparing since April 23, 2004.

One of these filings was an Affidavit about the stalking of the Plaintiffs to their grandchild's school. Officer Holt stated that this Affidavit was worse than the one where Jack Shi threatened the life of Samuel K. Jacobs. She stated that she thought that they should have filed a report then about that incident and not have waited. Officer Holt asked why the Plaintiffs had not filed that report since it had been ready since the incident. The  Plaintiffs realized at that point  that they should not have waited because of the concern that Officer Holt displayed.

IX.

Officer Holt called Samuel K. Jacobs on July 8, 2004 to see if the Plaintiffs had filed in the United States District Court, but because of a serious injury to Nancy M. Heckerman's foot and multiple visits to doctors' offices the

'Petition For Temporary Restraining Order' had not been completed. Officer
Holt requested a copy of the filings when they were completed.

## PREVIOUS INCIDENTS

The following incidents have occurred and Jacobs has recorded them
since he has become aware that Jack Shi's behavior has become bizarre and
the death threats are real:

April 23, 2004—Jack Shi came to the school of Jacobs' grandchild on
Thursday, April 23, 2004, when Samuel K. Jacobs was picking her up, and
threatened Jacobs and his family with physical violence and other criminal
acts if the evidence of the Defendants' criminal activities which Jacobs has in
his possession was not returned. Jack Shi also demanded extortion money or
'bad things would happen'.

Jack Shi has continually stalked the Samuel K. Jacobs' house by driving
on Evening Ride Drive which is the road directly behind the Jacobs' house and
has parked there to watch the house. Samuel K. Jacobs states that the
following incidents have happened at these times:

May 6, 2004—Jack Shi parked behind the house on Evening Ride Drive
and watched the house while telephoning the wife of Samuel K. Jacobs on his
cell phone at 10:23 PM. Jacobs' wife asked him if he was watching her from the
road and since she recognized his car. He said yes and seemed surprised that
she recognized Jack Shi's silver Navigator

May 18, 2004—Jack Shi was stopped by  security guards near the Jacobs' house at 8:15 PM (which was after dark at that time of year) and Shi stated that he  was looking for lots to build houses but he knows that all of the lots behind the Jacobs' house are sold since his wife, Yu Fan, is a realtor. Then Jack Shi said he was selling furniture and the guards asked him if he was going to knock on doors to sell his furniture.

May 19, 2004—Jack Shi dove by the Jacobs' house at 9:15 PM to see if the Jacobs' cars are at home. Jack Shi made statements about the Jacobs' 'small red  car' during one of his telephone conversations with Samuel K. Jacobs. The red car is parked in the garage with the  door  always down and has been out of the garage so little that it only has 225 miles on it. So, the only way that Jack Shi could know about the red car is if he was a peeping Tom looking into the Plaintiffs' windows. Does he pry into the Jacobs' other windows at the house other than the garage?

## CONTINUOUS STALKING

Even though the police visited Jack Shi and Officer Holt stated that she told Jack Shi not to telephone Samuel K. Jacobs and not to answer the telephone if he calls, Jack Shi's stalking and

Jack Shi has been seen on the road behind the Jacobs' residence at least every other day since the incident on July 4, 2004. Sometimes he comes everyday or twice a day. He has now been seen with another Chinese in a black

car and that car and driver have been seen alone multiple times driving behind the house.

It is difficult to spot a car at night on the Evening Ride Drive behind the Jacobs' house where new houses are being constructed but car lights appear very late at night and then are turned for a short time. Then the lights of the cars turn and leave. This has only been going on since the threats of Jack Shi started.

Affidavit pursuant to **Title 28 United States Code Annotated §1746.   Unsworn declarations under penalty of perjury.**
See *Dickinson v. Wainwright*, 626 F.2nd. 1184, held  that petition, which contained statement "I declare that under penalty of perjury that the foregoing is true and correct" above petitioner's signature, was sufficient even though certificate of oath may have been defective. One who subscribes to a false statement under penalty of perjury pursuant to federal statute may be charged with perjury just as if statements were made under oath. **Title 18 U.S.C.A. §1621; Title 28 U.S.C.A. §1746.**

# AFFIDAVIT

I declare under penalty of perjury, that to the best of my knowledge, the foregoing is true and correct. Executed on _____ (Date). MILAN PATEL  (Print Name), and

_____ (Signature).


That Milan Patel, being first duly sworn, deposes and says:

I.

KNOW ALL MEN BY THESE PRESENTS, that I, Mr. Milan V. Patel, do hereby state that I am the recipient of numerous threatening, harassing, and unwarranted telephone calls almost daily for over two months from a man known as Vijay Patel who claims that he resides in Montreal, Canada. I think that this man could be violent from the tone of these telephone calls, and since he has threatened my family I have to believe that he is capable of what he states since he has confirmed in a telephone message that he is associated with an Al Qaeda organization.

II.

Said Vijay Patel is of no known relationship to me, and in fact, I have never   met him in person in order to be able to give a physical description. However, he has obtained my name because of a business relationship and I believe that he has called me using not only his own name but that  he has disguised himself as other people. In  particular, I believe that he has been

**Exhibit D**

claiming to be an employee of the Royal Canadian Mounted Police by the name of "SANDY JOHNSON."

III.

Vijay Patel has stated that he has contacts in Maryland who will *"come look me up,"* and has stated that he knows my home address, how many children I have, the names of my family, my Social Security number, and other personal information. **I take these statements seriously since I sincerely believe that Vijay Patel has every intention of harming my family and me.** When another person threatens my child(ren) and wife, there is very little reason not to believe that if he has gone to this extent to find out about my personal life then he will  carry through with his threats. I believe that Jet Airways India has assisted him in obtaining this information and is partly responsible for Vijay Patel's erratic and hostile actions towards me.

IV.

In a telephone call that I received  on January 13, 2007, at 11:00 a.m., Vijay Patel stated that he was working with representatives from Jet Airways in India,  and gave the names of these individuals as: Boney Kapoor (Director), Javed Adhtar (Executive Director of the company), and Saroj Datta (Director). Although the telephone call is in an Indian language known as Gujarati, I believe a competent translator will verify my statements.

V.

From Vijay Patel's statements I believe that it can be ascertained that Vijay Patel is on a mission to bring information  about certain U. S. Citizens to

these aforesaid Jet Airways India individuals for his own advantage (whatever that may be) because of my business associations with JET AIRWAYS, INC. in the United States.

## VI.

Vijay Patel also stated in that telephone call on January 15, 2007, that he knew that that I was in contact with Ms. Nancy M. Heckerman who is President of JET AIRWAYS, INC. in the United States. Ms. Heckerman has filed documents with the United States Patent and Trademark Office and the Department of Transportation against the infringement of her company's trademark by Jet Airways India. He stated in Gujarati that she had lied about Jet Airways India. I believe the documents that Ms. Heckerman filed with the USPTO and the DOT were truthful because they are substantiated with documents from officials of the Indian Government.

## VII.

Vijay Patel has stated that he is coming to Maryland in the United States and is going to come to my house. He has also stated that he has other associates in the U.S. who will harass me with unfounded and untrue statements to the local police departments until I cooperate with him. I believe that Vijay Patel, who has stated that he hates the United States and left the United States to live in Canada, is a danger to not only my family, but these two countries as well due to his associations with the Al Qaeda.

Affidavit pursuant to **Title 28 United States Code Annotated §1746.**

**Unsworn declarations under penalty of perjury.**

See *Dickinson v. Wainwright,* 626 F.2nd. 1184, held that petition, which contained statement "I declare that under penalty of perjury that the foregoing is true and correct" above petitioner's signature, was sufficient even though certificate of oath may have been defective. One who subscribes to a false statement under penalty of perjury pursuant to federal statute may be charged with perjury just as if statements were made under oath. **Title 18 U.S.C.A. §1621; Title 28 U.S.C.A. §1746.**

### CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2008, I caused the foregoing to be served by First Class U.S. Mail: "AMENDED COMPLAINT FOR CONSPIRACY UNDERRACKETEERING INFLUENCED ACT AND CORRUPT ORGANIZATIONS ACT (RICO) PER JULY 10, 2008 ORDER" in the United States District Court for the District of Columbia on the following Defendants' attorney:


SIDNEY S. FRIEDMAN
WEINSTOCK, FRIEDMAN & FRIEDMAN, P.A.
Executive Centre
4 Reservoir Circle
Baltimore, Maryland 21208-7301


_____
Nancy Heckerman, Plaintiff

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**SAMUEL K. JACOBS, et al,**

      PLAINTIFFS,

  v.

**SIDNEY S. FRIEDMAN, et al,**

      DEFENDANTS.

CASE NO.: <u>1:07CV01625</u>

HONORABLE JUDGE:
   <u>REGGIE B. WALTON</u>

**ORDER**

## <u>ORDER</u>

On reading and filing the pleadings herein, the Plaintiffs having filed the Amended Complaint per the ORDER issued on July 10, 2008 by this Court, and the Defendants having responded, and for good cause showing

ORDERED, that the Court will allow the Plaintiffs the time to procure the names and evidence of others so similarly situated for this cause from the appropriate authorities, and,

ORDERED, that the "AMENDED COMPLAINT FOR CONSPIRACY UNDER RACKETEERING INFLUENCED ACT AND CORRUPT ORGANIZATIONS ACT (RICO) PER JULY 10, 2008 ORDER" is accepted by this Court and the case will proceed to be scheduled for trial by jury.

That the Clerk of this court hereby is ordered and directed to immediately certify and enter a copy of this order, and that the parties be ordered to proceed with the case from this day forward.

Done and ORDERED this _____ day of _____, 2008.

_____

JUDGE OF THE U.S. DISTRICT COURT